## STATE OF CONNECTICUT *v.* EDAN CALABRESE
## (SC 17560)

Sullivan, C. J., and Borden, Norcott, Palmer and Zarella, Js.*

---

\* The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued January 5—officially released August 15, 2006

*Mark Rademacher*, assistant public defender, with whom, on the brief, were *Julia E. Dudics* and *Rebecca*

*L. Perreault,* certified legal interns, for the appellant (defendant).

*Bruce R. Lockwood,* assistant state's attorney, with whom, on the brief, were *Michael Dearington,* state's attorney, *Seth R. Garbarsky,* deputy assistant state's attorney, and *Christine Collyer,* former special deputy assistant state's attorney, for the appellee (state).

*Opinion*

NORCOTT, J. The defendant, Edan Calabrese, appeals from the judgment of conviction of one count of assault of an elderly person in the second degree in violation of General Statutes § 53a-60b[1] in one case, and one count of violation of a protective order in violation of General Statutes (Rev. to 2001) § 53a-223[2] in another case. On appeal,[3] the defendant claims, inter alia, that

[1] General Statutes § 53a-60b provides in relevant part: "(a) A person is guilty of assault of an elderly, blind, disabled, pregnant or mentally retarded person in the second degree when such person commits assault in the second degree under section 53a-60 or larceny in the second degree under section 53a-123 (a) (3) and (1) the victim of such assault or larceny has attained at least sixty years of age, is blind or physically disabled, as defined in section 1-1f, or is pregnant, or (2) the victim of such assault or larceny is a person with mental retardation, as defined in section 1-1g, and the actor is not a person with mental retardation. . . .

"(d) Assault of an elderly, blind, disabled, pregnant or mentally retarded person in the second degree is a class D felony and any person found guilty under this section shall be sentenced to a term of imprisonment of which two years of the sentence imposed may not be suspended or reduced by the court."

[2] General Statutes (Rev. to 2001) § 53a-223 provides: "(a) A person is guilty of criminal violation of a protective order when an order issued pursuant to subsection (e) of section 46b-38c, or section 54-1k or 54-82r has been issued against such person, and such person violates such order.

"(b) Criminal violation of a protective order is a class A misdemeanor."

Effective October 1, 2002, violation of § 53a-223 became a class D felony. See Public Acts 2002, No. 02-127, § 3.

[3] The defendant appealed from the judgment of the trial court to the Appellate Court, and we subsequently granted the defendant's motion to transfer the appeal to this court pursuant to Practice Book § 65-2 and General Statutes § 51-199 (c).

the trial court improperly excluded from evidence certain messages left on his answering machine that were admissible under § 8-8 of the Connecticut Code of Evidence,[4] because they would have demonstrated the non-testifying complainant's bias and motive to make a false accusation of assault against him. We conclude that the trial court's exclusion of the answering machine recording was both improper and harmful and, accordingly, we reverse the judgment of conviction as to the assault charge. We affirm the judgment of conviction as to the defendant's violation of a protective order.

The record reveals the following facts and procedural history. The complainant, Maureen Calabrese, is the defendant's mother, and was sixty-nine years old at the time of the events at issue herein. On the evening of January 4, 2002, Branford police and paramedics, including Paul Cipriani, a paramedic, and Duncan Ayr, a detective, found the following scene at the complainant's home, which was located in front of the defendant's family owned home.[5] The complainant's now late husband, William Calabrese, Sr., was in a hospital bed in the living room of the house, unable to get up. The dining room of the house contained a hutch with broken glass, and there was glass debris on the floor. The complainant lay on the floor of the kitchen, surrounded by five or six blood soaked paper towels.

---

[4] Section 8-8 of the Connecticut Code of Evidence provides in relevant part: "When hearsay has been admitted in evidence, the credibility of the declarant may be impeached, and if impeached may be supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. . . ."

[5] The complainant had called Roger Klopfer, her next-door neighbor and brother-in-law, and told him that she was bleeding and needed help. After the complainant refused Klopfer's offer to call for medical assistance, he summoned William Calabrese, Jr., who is the defendant's older brother. William then drove from his home in Stratford to the complainant's house in Branford, and requested emergency assistance from the police and paramedics.

Cipriani testified that he had assessed and interviewed the complainant, and that she appeared scared and hesitant to answer his questions. Ayr testified similarly, noting that the complainant appeared disheveled and upset, with dried blood on her nightgown. The complainant did, however, tell Cipriani that she was injured when attempting to block a vase that had been thrown at her at approximately 10 a.m. Cipriani cleaned and bandaged the complainant's wound and monitored her while the police interviewed her and seized evidence from the scene, including a small vase. The complainant then refused ambulance transportation to the hospital.

The next day, however, the complainant's other son, William Calabrese, Jr. (William), brought her to Yale-New Haven Hospital, where she was diagnosed with a fracture of the olecranon, which is the bottom portion of the elbow joint. David Gibson, an orthopedic surgeon who had treated the complainant, testified that he operated immediately as her injury was a true limb threatening emergency because of the open wound and the delay in seeking treatment, which had increased the risk of infection.[6]

On the basis of information gained through interviews with William and the complainant, the Branford police arrested the defendant on the morning of January 5, 2002.[7] Under Docket No. CR02-394, the state charged

---

[6] Gibson stated that the complainant wore sunglasses and a hat, and seemed "very mysterious" to him during the hospital visit. Gibson testified, over the defendant's hearsay objection, that the complainant had told him that the injury was caused by a vase thrown by her son, and Gibson testified that the injury was consistent with that explanation. On cross-examination, Gibson testified that he did not know what happened to the complainant, other than what she had said, and he admitted that he was not aware that hospital records indicated that she had told a nurse at the hospital that she was injured when she had fallen in the bathroom.

[7] We note that the trial court overruled the defendant's objection to Ayr's testimony that he arrested the defendant for throwing the vase on the basis of the complainant's statement to him. That ruling forms the basis for one

the defendant with three alternative counts of assault of an elderly person in the second degree in violation of § 53a-60b and General Statutes § 53a-60 (a) (1) through (3).

In connection with the defendant's arraignment, the court, *Alexander, J.*, issued a family violence protective order on January 7, 2002 (protective order). The protective order directed the defendant, inter alia, to refrain from threatening, harassing or assaulting the complainant, and from entering the family dwelling or dwelling occupied by the complainant. According to the testimony of Tracy Genues-Johnson, a court clerk, the defendant was given a copy of and advised of his rights under the protective order. The protective order remained in effect and was not modified while the case was pending.

Several months later, on September 15, 2002, at approximately 9 p.m., Mark Ciarciello, a Branford police sergeant, received a call from William, and as a result of that conversation, responded to the complainant's home with several other officers. The complainant, who was crying and appeared disheveled and nervous, let Ciarciello and the other officers enter the house. The complainant also was holding her arm at the time,[8] but she was evasive about how her injuries had occurred.[9]

---

of the defendant's successful claims on this appeal. See footnote 20 of this opinion.

[8] Andrew Konspore, another paramedic from the Branford fire department, responded to the complainant's house with the police on September 15, 2002. He testified that the complainant was cradling her right arm, and that, when he examined it, he noticed numerous old and new bruises. The complainant told Konspore that she had been thrown to the floor, and kicked and punched in her abdominal area, head and side. She refused, however, transportation to the hospital.

[9] Kris Hormuth, another Branford police officer, brought camera equipment to the scene on September 15, 2002. The complainant showed her the injuries, but declined to permit Hormuth to photograph them. Hormuth testified that the complainant had a verbal dispute with William and seemed angry to see him when he arrived from Stratford.

Ciarciello knew that the protective order was in effect against the defendant,[10] and he called for a K-9 unit to assist with a search of the house for the defendant.

Shortly thereafter, David Atkinson, the Branford K-9 officer, arrived with Red, a police trained German Shepherd. Relying on Red's ability to detect nervous or apprehensive persons, they searched the house and found the defendant naked on the roof of the house near a small porch located off a second floor bedroom. The defendant then climbed around the chimney to come down onto the porch, at which point Atkinson and another officer, Arthur Ferris, took the defendant into custody. Under Docket No. CR02-9309, the state then charged the defendant with one count of violating a protective order in violation of General Statutes § 53a-110b, and one count of assault of an elderly person in the third degree in violation of General Statutes §§ 53a-61 (a) (1) and 53a-61a.

On the state's motion, the trial court, *Thompson, J.,* joined the two cases for trial. Subsequently, the case was tried to the jury, with *Rodriguez, J.,* presiding. Neither the defendant *nor the complainant* testified at the trial.[11] After the state rested its case, the defendant

---

[10] Ciarciello testified that all currently effective criminal protective orders are logged at the police station, and that he had reviewed the protective order in the present case prior to responding to the scene.

[11] The record reveals, and the jury was instructed, that, on October 17, 2003, the court, *Thompson, J.,* granted the complainant's motion, made through her attorney, to quash the state's subpoena served on the complainant because it had not been served by a disinterested party. Thereafter, a marshal left a second subpoena at the complainant's home, to which the complainant did not respond.

In order to answer what the trial court called the jury's "million dollar question," namely, the complainant's whereabouts, the jury heard the following testimony. On October 27, 2003, the trial court, *Rodriguez, J.,* issued a capias to enforce the subpoena, which was served by an inspector from the state's attorney's office, Frank Myjak, a sergeant with the Branford police department, and Aida Casanova, a domestic violence victims' advocate assigned to the complainant's case. They entered the complainant's residence, saw no evidence that she was home, and left a copy of the capias

moved for judgments of acquittal on all charges. With respect to Docket No. CR02-394, the trial court granted the motion for judgment of acquittal as to the first and second counts of assault of an elderly person in the second degree, but denied it as to the third count, which referred to the defendant's "reckless" conduct on January 4, 2002. With respect to Docket No. CR02-9309, the trial court granted the defendant's motion for judgment of acquittal on the assault of an elderly person in the third degree charge, but denied the motion as to the violation of the protective order on September 15, 2002. Thereafter, the jury returned verdicts of guilty of assault of an elderly person in the second degree in violation of § 53a-60b, and of violation of a protective order in violation of § 53a-223. On December 19, 2003, the trial court rendered judgment in accordance with the jury's verdict, and sentenced the defendant to a total effective sentence of five years imprisonment suspended after the mandatory minimum two years, with five years of probation.[12] This appeal followed.

On appeal, the defendant contends that there was insufficient evidence to prove beyond a reasonable doubt that he "recklessly" caused the complainant's injuries. The defendant also claims that the trial court improperly: (1) admitted into evidence, under both the Connecticut Code of Evidence and the United States Supreme Court decision in *Crawford* v. *Washington*,

on the kitchen counter. Myjak also testified, however, that he had been instructed by the state's attorney for the New Haven judicial district not to use force or physically arrest the complainant.

[12] The total effective sentence was calculated by a sentence of five years imprisonment on Docket No. CR02-394, with execution suspended after the statutory mandatory minimum period of two years followed by five years of probation. The trial court also sentenced the defendant to a concurrent term of imprisonment for one year for the conviction on Docket No. CR02-9309. The defendant's probation included special conditions of anger management classes, psychiatric evaluation and treatment, and substance abuse evaluation and treatment. The trial court also ordered the defendant not to harass or otherwise to threaten the complainant.

541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), testimonial and documentary evidence containing inadmissible hearsay statements made by the nontestifying complainant to police officers and medical personnel;[13] and (2) refused to admit into evidence certain messages left by the complainant on the defendant's answering machine.

I

We begin with the defendant's claim that there is insufficient evidence to prove beyond a reasonable doubt that he recklessly caused the complainant's injuries. This claim was properly preserved by his motion for a judgment of acquittal on that charge; see *State* v. *Padua*, 273 Conn. 138, 146 n.12, 869 A.2d 192 (2005); and we must review it in addition to his evidentiary claims because, if the defendant prevails on the sufficiency claim, he is entitled to a directed judgment of acquittal rather than to a new trial. Id., 179; see also *State* v. *Gray*, 200 Conn. 523, 535–36, 512 A.2d 217, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). Moreover, our sufficiency review does not require initial consideration of the merits of the constitutional and evidentiary claims because "appellate review of the sufficiency of the evidence, pursuant to [*Gray*] properly includes hearsay evidence even if such evidence was admitted despite a purportedly valid objection. Claims of evidentiary insufficiency in criminal cases are always addressed independently of claims

---

[13] We note that the defendant filed a motion in limine seeking to preclude the state from eliciting testimony about out-of-court statements by the complainant. The trial court denied that motion in limine. The defendant also filed a second motion in limine seeking to preclude the state from offering into evidence testimony or medical records recounting out-of-court statements by the complainant about how her injury was caused and who was responsible for it. The trial court denied that motion with respect to the causation of the complainant's injuries.

of evidentiary error." *State* v. *Carey*, 228 Conn. 487, 496, 636 A.2d 840 (1994).[14]

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving

---

[14] See also, e.g., *State* v. *Smith*, 73 Conn. App. 173, 179–80, 807 A.2d 500 ("[F]or the purposes of sufficiency review after concluding that a new trial is required, we review the sufficiency of the evidence as the case was tried; in other words, we review the evidence in its improperly restricted state, impropriety notwithstanding. . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial." [Citations omitted; internal quotation marks omitted.]), cert. denied, 262 Conn. 923, 812 A.2d 865 (2002).

substantial circumstantial evidence. . . . In evaluating evidence, the [finder] of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [finder of fact] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [finder of fact's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Gary*, 273 Conn. 393, 405–406, 869 A.2d 1236 (2005); see also *State* v. *Morgan*, 274 Conn. 790, 800, 877 A.2d 739 (2005) ("[W]e do not sit as a thirteenth juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record. . . . Rather, we must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." [Internal quotation marks omitted.]).

The defendant contends that there is no evidence in the record as to his specific intent, namely, recklessness. Specifically, he argues that, although there is evidence that he threw the vase at the complainant, there is no evidence as to the circumstances under which she was injured, and that he could, for example, have "been outside cleaning out a box and thrown the vase over his shoulder, not knowing the complainant was nearby." Thus, the defendant contends that there are

no facts in the record from which it may be inferred that he knew of a risk and consciously disregarded it. In response, the state argues that recklessness may be inferred from the complainant's statements to Cipriani and Gibson that her elbow was injured when she tried to block the vase from striking her in the head, as well as the serious nature of the resulting injuries. We agree with the state.

We begin with a review of the relevant statutory provisions. The defendant was convicted of assault of an elderly person in the second degree under § 53a-60b (a) because the jury found that he had "commit[ted] assault in the second degree under section 53a-60 or larceny in the second degree under section 53a-123 (a) (3) and (1) the victim of such assault . . . has attained at least sixty years of age . . . ." See footnote 1 of this opinion. The cross referenced statute, § 53a-60 (a) (3), provides in relevant part that a person is guilty of assault in the second degree when "he *recklessly* causes serious physical injury to another person by means of a deadly weapon or a dangerous instrument . . . ." (Emphasis added.) "A person acts 'recklessly' with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ." General Statutes § 53a-3 (13).

Although the defendant correctly notes that the record does not contain evidence setting the scene of the altercation between the defendant and the complainant, there nevertheless is sufficient evidence that he acted recklessly. As the state points out, a nurse's note in the hospital record reflects that the complainant had stated that, " 'I feel very embarrassed to tell you

the truth how I broke my elbow. My son [threw] a vase [and] I [tried] to protect my head." We also note Cipriani's testimony to a similar effect, that the complainant had tried to block the thrown vase. Moreover, the jury received the vase as an exhibit, and we note that it is approximately the size of a softball; it is compact enough to throw with significant velocity, but has weight sufficient to cause serious injury to someone hit by it.[15] Thus, the jury reasonably could have found beyond a reasonable doubt that the defendant was "aware of and consciously disregard[ed] a substantial and unjustifiable risk" that the complainant would have been seriously injured by the thrown vase, and that throwing a vase at her "constitute[d] a gross deviation from the standard of conduct that a reasonable person would observe in the situation . . . ." General Statutes § 53a-3 (13). Accordingly, we now turn to the defendant's evidentiary claims.

## II

The remainder of our inquiry begins and ends with the defendant's claim that the trial court improperly refused to admit into evidence the answering machine recording with statements by the complainant threatening the defendant. The record reveals the following additional relevant facts and procedural history. During cross-examination of William, the defendant attempted to offer into evidence several messages left by the complainant on the defendant's answering machine.[16] At

---

[15] Indeed, our visual inspection of the vase reveals that the only damage to it was a small chip on its side.

[16] We note that the answering machine containing the recordings at issue was inadvertently not marked for identification at trial. The trial court, however, granted the defendant's motion for rectification pursuant to Practice Book § 66-5, subject to verification of the authenticity of the messages. The state and the defendant subsequently stipulated that "this tape recording was the one offered by the defense at trial and played for Judge Rodriguez, as referenced at page [forty-two] of the transcript of October 30, 2003," and that "this answering machine tape recording is authentic."

this point, the jury was excused, and after William authenticated the voice on the recording as that of the complainant, the trial court listened to the messages, which included the complainant calling the defendant derogatory names such as "prick" and "bastard," and threatening to call the police and the victim's advocate if the defendant did not bring her food.[17] The trial court then sustained the state's objection, concluding that the recording was both irrelevant and inadmissible hearsay not subject to any exception, and that it would be inappropriate to use the tape recording with the complainant's whereabouts unknown. The trial court did, however, permit the defendant to question William about his mother's nature when she becomes agitated or intoxicated. William then testified before the jury that, although he "didn't really want to get into family dynamics," the complainant "could be charming when she wanted to be charming. [The complainant] could be manipulative when she wanted to be manipulative. She could be angry when she wanted to be angry."

"We first set forth .the standard that governs our review of a trial court's evidentiary ruling. It is axiom-

---

[17] In its entirety, the answering machine recording contained a string of separate messages from the complainant and provided as follows:

"Edan.

"Please pickup Edan.

"Would you pick up please?

"Pick up will you? [PAUSE] Are you there?

"Are you there? [PAUSE] Pick up. Pick up if you're there. [PAUSE] I just wanted to say good luck and I love you.

"Are you there? Pick up. [PAUSE] [Sigh] Are you there?

"Pick up. [PAUSE] Pick up! [PAUSE] Pick up! [PAUSE] You prick!

"You'd better come down here and pick up the pork and bring my groceries down here before I call the police.

"Pick up. Won't you pick up?

"I asked for a goddamn sandwich and I never got it and I had a call from the victim's advocate and you are in a hell of a lot of trouble if you don't bring me my sandwich—cheeseburger! You better bring it here and leave it right on the doorstep you son of a bitch you bastard!

"Pick up. [PAUSE] Please pick up.

"Please pick up. [PAUSE] Please pick up."

atic that [t]he trial court's ruling on the admissibility of evidence is entitled to great deference. . . . In this regard, the trial court is vested with wide discretion in determining the admissibility of evidence, including issues of relevance and the scope of cross-examination. . . . Accordingly, [t]he trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be made in favor of the correctness of the trial court's ruling, and we will upset that ruling only for a manifest abuse of discretion. . . . This deferential standard is [generally] applicable to evidentiary questions involving hearsay." (Citations omitted; internal quotation marks omitted.) *State* v. *Perkins*, 271 Conn. 218, 252, 856 A.2d 917 (2004).

We begin with § 8-8 of the Connecticut Code of Evidence, which provides: "When hearsay has been admitted in evidence, the credibility of the declarant may be impeached, and if impeached may be supported, by any evidence that would be admissible for those purposes if the declarant had testified as a witness. Evidence of a statement of the declarant made at any time, inconsistent with the declarant's hearsay statement, need not be shown to or the contents of the statement disclosed to the declarant."[18] Section 8-8 recognizes that "[t]he

---

[18] We address the state's argument that this claim was not preserved adequately at trial, and therefore, is unreviewable because, as the defendant concedes, he did not provide the trial court with a citation to § 8-8 of the Connecticut Code of Evidence in his arguments on this issue at trial. We note that the trial court's discussion of this issue with the parties consumed more than fourteen pages of transcript. The defendant made an extensive offer of proof in which he explained the effect of the tape recording with respect to rebutting the "implication that's been floating to the jurors that we are dealing with some poor, gentle, [quiet], pathetic, elderly victim. The tape is compelling evidence that his mother is an extremely aggressive, abusive and, obviously, an intoxicated person." In response to the state's argument that the tape recording was improper character evidence and could not be used to impeach the complainant because she was not a witness at the trial, the defendant further argued that the tape recording and the

weight a fact finder gives a witness' in-court testimony often depends on the witness' credibility. So too can a declarant's credibility affect the weight accorded that declarant's hearsay statement admitted at trial." Conn. Code Evid. § 8-8, commentary; see also *State* v. *Jordan*, 663 N.W.2d 877, 880 (Iowa 2003) (rule permitting impeachment of hearsay declarant "primarily exists to even the playing field when a party attempts to present

veiled threats contained thereon was important evidence of how the complainant "behaves and it is consistent with how she gets when she demand[s] things," particularly given that the state's entire case was built on hearsay. The defendant called the messages "compelling evidence of a very disturbed, very manipulative woman."

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to apprise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Cabral*, 275 Conn. 514, 530–31, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005).

We conclude that this issue was properly preserved as a claim of evidentiary error. Although it would have been preferable for the defendant to have cited § 8-8 to the trial court, the defendant's objection, "while not the most artful, sufficiently alerted both the trial court and the [state] to the precise nature of the objection." *Daley* v. *McClintock*, 267 Conn. 399, 405, 838 A.2d 972 (2004); accord *Commonwealth* v. *Mahar*, 430 Mass. 643, 650, 722 N.E.2d 461 (2000) (issue preserved for appeal when trial counsel failed to cite rule, but "argument tracked the substance of the rule"). The defendant clearly argued the policy and substance underlying § 8-8 at trial, and gave the trial court ample opportunity to accept that argument. We, therefore, do not view this case as an impermissible ambuscade wherein the defendant argues one theory at trial, and an entirely different one on appeal. Cf. *State* v. *Cabral*, supra, 275 Conn. 531 (claim not preserved for appellate review when defendant argued distinctly different theory on appeal than was discussed in trial court).

hearsay evidence through a witness other than the declarant in an effort to prevent the other party from challenging the declarant's credibility or to capitalize on the good credibility of the witness"); *Commonwealth* v. *Mahar*, 430 Mass. 643, 650, 722 N.E.2d 461 (2000) (adopting rule of evidence similar to § 8-8 because "[t]here is no reason to put a proponent of an absent witness in a better position than a proponent of a live witness").

The state properly notes that § 8-8 is not in itself an exception to the hearsay rule, and that it, therefore, "does not permit a hearsay declarant to be impeached by hearsay that would otherwise have been inadmissible." Accordingly, the state argues that *State* v. *Mills*, 80 Conn. App. 662, 837 A.2d 808 (2003), cert. denied, 268 Conn. 914, 847 A.2d 311 (2004), which is relied on by the defendant, is inapposite. In *Mills*, the Appellate Court concluded that the trial court should have permitted the defendant to impeach the credibility of a dying declarant under § 8-8 by using evidence of prior convictions, which would have been admissible under § 6-7 (a) of the Connecticut Code of Evidence. Id., 667–68. We disagree with the state because, in the present case, the answering machine recording is not hearsay since it clearly was offered not for the truth of the matter asserted therein, but merely for the fact that those statements had been made. *State* v. *Perkins*, supra, 271 Conn. 254; see also *State* v. *Walker*, 214 Conn. 122, 131, 571 A.2d 686 (1990) (Evidence of threats against a witness are admissible to rehabilitate her inconsistent testimony and "to explain the discrepancy between her trial testimony and her pretrial statement. For that purpose, the evidence of threats was relevant to show [the witness'] state of mind and was not hearsay because it was not offered for its truth."); *State* v. *Lewtan*, 5 Conn. App. 79, 84, 497 A.2d 60 (1985) (testimony about threats made by defendant over telephone in harassment con-

viction not inadmissible hearsay because they "were offered not to prove that her statements were true but that she made them").

Thus, the answering machine messages were admissible nonhearsay evidence under § 6-5 of the Connecticut Code of Evidence, under which "[t]he credibility of a witness may be impeached by evidence showing bias for, prejudice against, or interest in any person or matter that might cause the witness to testify falsely." See also *State* v. *Bova*, 240 Conn. 210, 219, 690 A.2d 1370 (1997) ("Impeachment of a witness for motive, bias and interest may also be accomplished by the introduction of extrinsic evidence. . . . The same rule that applies to the right to cross-examine applies with respect to extrinsic evidence to show motive, bias and interest . . . ." [Internal quotation marks omitted.]). We can think of no better evidence of animus that might show a motive for making false allegations than the threats of seeking the arrest of the defendant if he did not comply with the complainant's wishes, and other invectives, contained in the messages that the trial court improperly excluded from the jury's consideration.[19]

[19] We also disagree with the state's contention that the answering machine messages were inadmissible because "[a] witness may be impeached by evidence of specific acts of misconduct that relate to veracity, but not by those that merely illustrate general bad behavior." (Internal quotation marks omitted.) *State* v. *Grant*, 89 Conn. App. 635, 643, 874 A.2d 330, cert. denied, 275 Conn. 903, 882 A.2d 678 (2005); see also *State* v. *Lambert*, 58 Conn. App. 349, 357, 754 A.2d 182 (drug dealing and prostitution by victim not relevant to question of victim's veracity or "to any substantive or material issue in the case"), cert. denied, 254 Conn. 915, 759 A.2d 507 (2000). The answering machine messages at issue in the present case relate directly to the relationship between the defendant and the complainant, and are evidence of the animosity between them, as well as the complainant's use of threats involving the authorities to get the defendant to do her bidding.

The state also claims that the messages were irrelevant because the answering machine contains neither time stamps indicating when the messages were left, nor an indication that the answering machine belonged to the defendant, such as an outgoing greeting. It is, however, abundantly clear that the answering machine belongs to the defendant because the complainant called him by name twice in the messages. See footnote 17 of

Having concluded that the trial court abused its discretion by excluding the tape recording from evidence, we now consider whether the defendant has proven that impropriety to be harmful error requiring that he receive a new trial.[20] In *State* v. *Sawyer*, 279 Conn. 331, 354, 904 A.2d 101 (2006), we recently resolved our "two competing formulations of the standard" for determining when an improper evidentiary ruling constitutes harmful error. We embraced the "outcome determinative approach followed by the overwhelming majority of state and federal courts," and concluded that, "the proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error." Id., 357. In applying this standard, which "expressly requires the reviewing court to consider the effect of the erroneous ruling on the jury's decision," an appellate court may conclude that a nonconstitutional error is harmless only when it "has a fair assurance that the

this opinion. Moreover, although interruptions to the machine's power supply apparently have resulted in the deletion of time stamps, the lack of a time reference does not render the messages irrelevant as evidence of the complainant's ill feelings about the defendant.

[20] We also note that, at oral argument before this court, the state conceded that the trial court improperly overruled the defendant's objection to Ayr's testimony that he had learned enough information from his conversation with the complainant to have probable cause to arrest the defendant. The state conceded that this statement was implied hearsay not subject to any applicable hearsay exception. See *In re Jose M.*, 30 Conn. App. 381, 386, 620 A.2d 804 ("The conversation was not repeated verbatim by [the coconspirator] but, nevertheless, his testimony expressly conveyed the substance of the conversation. As such, [the coconspirator's] testimony, by implication, presented out-of-court statements that if offered as assertions or to prove the facts asserted would run afoul of the hearsay rule."), cert. denied, 225 Conn. 921, 625 A.2d 821 (1993); accord *State* v. *Colon*, 272 Conn. 106, 196, 864 A.2d 666 (2004) (implied hearsay admissible when officer's testimony was not offered "for the purpose of identifying the defendant as the perpetrator of the victim's death or the injuries of the victim's sister, but for the limited purpose of explaining why the police had asked the defendant to accompany them to the police station"), cert. denied, 546 U.S. 808, 126 S. Ct. 102, 163 L. Ed. 2d 116 (2005).

error did not substantially affect the verdict." (Internal quotation marks omitted.) Id., 357. In reviewing the case, we consider a number of factors, namely, the overall strength of the state's case, the impact of the improperly admitted or excluded evidence on the trier of fact, whether the proffered evidence was cumulative, and the presence of other evidence corroborating or contradicting the point for which the evidence was offered. See id., 358.

With respect to the assault charge, we are left with the requisite "fair assurance" that the trial court's failure to admit the answering machine messages into evidence "substantially swayed" the jury's verdict. The only evidence in the record on the assault charge consisted of hearsay statements by the complainant made to the police, paramedics and medical personnel at Yale-New Haven Hospital, at least one of which the state concedes was improperly admitted. See footnote 20 of this opinion. Thus, the jury's perception of the complainant's credibility was central to the state's case. Having listened to both the tone and substantive content of the messages; see footnote 17 of this opinion; we are left with no doubt that these messages demonstrating the complainant's inclination to make threats against the defendant would have had a significant effect on the jury's assessment of her credibility. Moreover, the messages would not have been cumulative, despite William's testimony about the complainant's manipulative nature and treatment of himself and his brother. This is because William's admittedly poor relationship with his mother and brother could have caused the jury to perceive him, too, as a biased witness.[21] Instead, the

---

[21] William testified that, after January, 2002, he visited the complainant only "sporadically" because of family dynamics, frequently leaving money and groceries on the porch because she refused to see him. William testified that the complainant came to live with him and his family after her husband died, but after she went home, she refused to talk to him any more because she blamed him for the defendant's arrest. The complainant also had revoked a power of attorney that she had given to William. We further note Officer

recorded messages provide an untainted source for the jury to understand the animus between the complainant and the defendant, and the resulting bias that might have attached to her statements that were admitted as hearsay evidence. The defendant is, therefore, entitled to a new trial on the assault charge.

We need not consider the remainder of the defendant's claims under both *Crawford* v. *Washington*, supra, 541 U.S. 36, and the Connecticut Code of Evidence, with respect to the admission of the complainant's statements made to Ayr and Gibson, and contained in the hospital records.[22] We do not view them as likely to arise on remand, and to the extent that they relate to the defendant's conviction for violation of a protective order, they are at most harmless error not requiring reversal on that count, even if we were to assume, without deciding, that the trial court committed a sixth amendment violation under *Crawford* by admitting into evidence Officer Kris Hormuth's testimony about the complainant's statements to her on September 15, 2002. See footnote 9 of this opinion. The trial court properly instructed the jury that "the types of acts forbidden by the protective order include . . . entering the family dwelling or the dwelling of the victim . . . ." In the absence of evidence of either a ground ladder, or as was suggested at oral argument by this court, that the defendant happens to be Spiderman, the jury's verdict

Kris Hormuth's testimony that she learned from speaking to William in September, 2002, that he and the defendant did not speak.

[22] We note that the state filed a letter, pursuant to Practice Book § 67-10, alerting us, inter alia, of the release of the United States Supreme Court's decision in *Davis* v. *Washington*, 547 U.S. 813, 126 S. Ct. 2266, 2273–74, 165 L. Ed. 2d 224 (2006), in which it articulated the "primary purpose" test for determining whether statements to a police officer or dispatcher are testimonial, and therefore, inadmissible under *Crawford* v. *Washington*, supra, 541 U.S. 36, in the absence of a prior opportunity for cross-examination by the defendant. Because of the posture of the present case, and our resolution of the defendant's evidentiary claims, we need not consider the defendant's constitutional claims in light of *Davis*.

is overwhelmingly supported by the testimony of the police officers who found the defendant naked on the roof of the complainant's house on September 15, 2002. Accordingly, any *Crawford* violations with respect to that conviction are harmless beyond a reasonable doubt. See, e.g., *State* v. *Carpenter*, 275 Conn. 785, 832, 882 A.2d 604 (2005) ("Where a claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt. . . . Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." [Citations omitted; internal quotation marks omitted.]), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006).

The judgment of conviction of assault of an elderly person in the second degree is reversed and the case is remanded for a new trial on that charge; the judgment of conviction of violation of a protective order is affirmed.

In this opinion the other justices concurred.