******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RICHARD CAMPBELL
(AC 38763)

DiPentima, C. J., and Alvord and Pellegrino, Js.

*Argued September 12—officially released November 1, 2016*

(Appeal from Superior Court, judicial district of New Britain, D'Addabbo, J.)

*Glenn W. Falk*, assigned counsel, for the appellant (defendant).

*Laurie N. Feldman*, special deputy assistant state's attorney, with whom, on the brief, was *Brian Preleski*, state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Richard Campbell, appeals from the judgment of conviction, rendered after a court trial, of attempt to commit murder in violation of General Statutes §§ 53a-49 (a) (2)[1] and 53a-54a (a),[2] and risk of injury to a child in violation of General Statutes § 53-21 (a) (1).[3] On appeal, the defendant claims that the court's rejection of the affirmative defense of mental disease or defect, otherwise known as the insanity defense, was not reasonably supported by the evidence.[4] We affirm the judgment of the court.

Approximately one month after the trial, the court orally rendered its factual findings and legal conclusions in open court. The defendant was a forty-four year old male and a lifelong friend of T.C.[5] On or about July 27, 2013, T.C. invited several friends to her home to celebrate her birthday. The party began in the early afternoon, and the defendant was present. The defendant left the party sometime in the afternoon, and T.C. was unaware of his whereabouts.

The defendant eventually returned the same day and, although T.C. testified that the defendant appeared "a little tipsy," he appeared to be in control of his actions. Upon the defendant's return, T.C. suggested that the defendant take a nap in an upstairs bedroom, and he did so. After the guests departed, the defendant came downstairs and asked whether he could stay the night.[6] T.C. agreed and allowed the defendant to use her child's bedroom.[7] After this conversation, the defendant, T.C., and her child retired to their respective bedrooms.[8]

In the early morning of July 28, 2013, T.C. was awoken by several blows to her head. The defendant struck T.C. repeatedly over the head with a hammer and told her he was going to kill her.[9] During this encounter, T.C.'s six year old child was in the bed next to her. T.C. demanded that the defendant stop, but he did not. She eventually escaped from the room and asked her child to call 911. The defendant then told the child, "if you call 911, I will kill you too."[10] During T.C.'s initial escape, she reached the stairs but was pushed down them by the defendant. Injured and at the bottom of the stairs, T.C. attempted to reach the front door, but the defendant threw her on the couch. The defendant straddled T.C. and again repeatedly struck her with the hammer. She eventually broke free, exited her home through the back door, and ran to her neighbor's house. An ambulance was called and responded to her neighbor's house, and T.C. was taken to the hospital.

New Britain police Officers Gregory Harkins and Brian Shea were dispatched to T.C.'s street. En route, the officers observed the defendant in the street wearing only boxer shorts and moccasins with what appeared to be blood covering his body. The officers "smelt an odor of alcoholic beverage emanating from

his person" and, when questioned, the defendant indicated that he had consumed three beers.

The officers called for an ambulance, and the defendant was transported to the Hospital of Central Connecticut (hospital) for observation. Christopher Yergen, a physician, assessed and treated the defendant, and noted in his records the defendant's recollection of what happened earlier that morning. After further observation and assessment, the defendant was released the following day from the hospital to the custody of the New Britain Police Department.

The defendant then was interviewed by Detective Michael Steele following a voluntary waiver of his *Miranda* rights. The defendant at that time stated that he recalled standing over the victim's bed then blacking out, seeing the victim bleeding and crying, and admitted that he struck her with a hammer but could not recall why he did it. The defendant also recalled having "words" with the victim and believed that he was "physically hitting her but not mentally."

The defendant subsequently was charged with the attempted murder of T.C. and risk of injury to her child. The defendant elected to be tried by the court and raised the affirmative defense of mental disease or defect. At the conclusion of trial, the court found the defendant guilty, on both counts, beyond a reasonable doubt and that "the defendant has not sustained his burden of proof [by a] preponderance of the evidence for this [affirmative] defense . . . that he had a mental disease or defect . . . [and] as a result he lack[ed] a substantial capacity . . . to control his conduct within the requirements of [the] law." The court rendered judgment accordingly and sentenced the defendant to twenty-three years of incarceration followed by seven years of special parole. This appeal followed.

On appeal, the defendant claims that the court's rejection of the affirmative defense of mental disease or defect was not reasonably supported by the evidence. He argues that the court improperly disregarded undisputed witness testimony and rejected an expert witness' conclusion that the defendant lacked substantial capacity to conform his conduct within the law. We disagree.

As an initial matter, we set forth our standard of review. "The evaluation of . . . evidence on the issue of legal insanity is [within] the province of the finder of fact . . . . We have repeatedly stated that our review of the conclusions of the trier of fact . . . is limited. . . . This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The probative force of direct and circumstantial evidence is the same. . . . The credibility of expert witnesses

and the weight to be given to their testimony and to that of lay witnesses on the issue of sanity is determined by the trier of fact." (Internal quotation marks omitted.) *State* v. *Medina*, 228 Conn. 281, 309, 636 A.2d 351 (1994).

The affirmative defense of mental disease or defect is codified in General Statutes § 53a-13 (a) and provides that "[i]n any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."[11] "Whereas an *affirmative defense* requires the defendant to establish his claim by a preponderance of the evidence, a properly raised *defense* places the burden on the state to disprove the defendant's claim beyond a reasonable doubt." (Emphasis in original.) *State* v. *Revels*, 313 Conn. 762, 778, 99 A.3d 1130 (2014), cert. denied, U.S. , 135 S. Ct. 1451, 191 L. Ed. 2d. 404 (2015).

The following additional facts are relevant to this issue. During the state's case-in-chief, Harkins testified that when he and Shea arrived on the scene, the defendant was "rambling and kind of yelling," so the officers asked him some general questions to gauge his mental state. The defendant understood Harkins' commands, but some of his answers to the officers' questions were "non sequitur." According to Harkins, the defendant recounted the incident to the officers "intelligibly" and stated that he believed that he killed the victim. Further, Harkins observed the defendant speaking to someone who was not there, and the defendant asked aloud, "why did you make me do it?" Harkins also testified that the defendant's overall demeanor was volatile; the defendant would be calm one moment, then the next moment, become angry and bang his head.

Susan Hernandez, a fact witness, was called to testify by the defendant. Hernandez testified that her father had raised the defendant and that she considered the defendant her brother. Hernandez recalled that in August, 2012, the defendant was "very distraught, terrified, shaking, [and] crying." She also recalled that the defendant had told her that he was hearing voices and that he had been hearing those voices for a long time. According to Hernandez, the defendant was hospitalized several times for hearing voices, not sleeping for days, and having severe headaches.

The defendant also called Andrew Meisler, a clinical and forensic psychologist, as an expert witness. Meisler conducted a mental health evaluation of the defendant over the course of two meetings in early 2014. Meisler also reviewed the defendant's medical records dating back to 2008 through his hospitalization on July 28, 2013.

During the meetings with Meisler, the defendant told him that he did not recall hearing voices at the time of the incident and that he just told the police that he did. Meisler found this to be significant because the defendant's medical records indicated that he suffered from auditory hallucinations, and Meisler opined that the defendant's failure to recall auditory hallucinations spoke to the defendant's overall diminished mental state.

Meisler's opinion as to the defendant's mental state at the time of his arrest and the assault was that "he was in an acute impaired mental state" and possessed "an inability to control his behavior in a meaningful or willful way."[12] Meisler used the term "ego-dystonic" in his evaluation of the defendant and defined it as "actions or behaviors that are inconsistent with the way somebody sees themselves or wants to be seen." Meisler concluded that the defendant was "clearly ego-dystonic." Meisler's opinion was based on the defendant's medical records, the police officers' observations, and Meisler's personal interactions with the defendant.

On cross-examination, the state introduced Meisler's March, 2014 report, which conflicted with his testimony at trial. That report opined that the defendant's impairment on July 28, 2013 "was due to a combination of several factors including . . . the use of alcohol."[13] Meisler was asked if his prior report was still his opinion. Meisler testified his opinion at trial was "a hybrid of those two opinions." Meisler also testified that he could not rule out the possibility that alcohol or prescription medication was a contributing factor because it "remains an uncertainty given that no one knows exactly whether or not [the defendant] took any of those, [so] those may in fact be contributors."

The state also used the hospital's behavioral assessment of the defendant to cross-examine Meisler. This assessment indicated that the defendant was never treated for auditory hallucinations in the past and that his behavior was within normal behavioral and cognitive limits on the day of the crime. Further, the assessment mentioned that the defendant "calmly [spoke] about beating [T.C.] while eating [f]rench fries] from his lunch," and he appeared to have a "calm demeanor when being evaluated by Dr. Yergen."

"It is well established that [i]n a case tried before a court, the trial judge is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 26,

807 A.2d 955 (2002).

"[I]n its consideration of the testimony of an expert witness, the [fact finder] might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them. . . . [T]he [fact finder] can disbelieve any or all of the evidence on insanity and can construe that evidence in a manner different from the parties' assertions. . . . It is the trier of fact's function to consider, sift and weigh all the evidence including a determination as to whether any opinions given concerning the defendant's sanity were undercut or attenuated under all the circumstances." (Citations omitted; internal quotation marks omitted.) *State* v. *Quinet*, 253 Conn. 392, 407–408, 752 A.2d 490 (2000).

The defendant argues that the court's disregard of the "undisputed" testimony of Hernandez and Harkins was not reasonably supported by the evidence. Specifically, the defendant claims that the "trial court made no mention of these two critical pieces of evidence which supported rather than undercut" Meisler's opinion. We base our rejection of these claims on the broad discretion given to the fact finder. See *State* v. *Quinet*, supra, 253 Conn. 408.

First, the court recognized the familial relationship between Hernandez and the defendant. The court reasonably could have concluded that Hernandez possessed a bias because of her sibling like relationship with the defendant. See *State* v. *Calabrese*, 279 Conn. 393, 403, 902 A.2d 1044 (2006) ("[t]he [fact finder] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical" [internal quotation marks omitted]). Further, her testimony primarily identified the defendant's past hospitalizations "due to hearing voices, not sleeping for days, and anxious behavior." The court reasonably could have concluded that the defendant's past hospitalizations were not determinative of his mental state at the time of the incident. Ultimately, the court was not required to "mention" Hernandez' testimony because "[t]he [trier of fact] can disbelieve any or all of the evidence on insanity . . . ." *State* v. *Quinet*, supra, 253 Conn. 408.

Next, the defendant argues that Harkins' "undisputed" testimony was also unreasonably disregarded by the court. Again, we do not find this argument persuasive. Although the defendant argues Harkins' testimony is undisputed, the record indicates a conflict with Harkins' observations of the defendant and the defendant's admissions to Meisler. Specifically, Harkins observed that the defendant was speaking to someone who was not there; however, the defendant later reported to Meisler that he had not heard voices during the commis-

sion of the crime. We conclude that the court did not disregard Harkins' testimony but used its discretion, as the fact finder, to resolve conflicting evidence. See *State* v. *Quinet*, supra, 253 Conn. 407 ("[t]he evaluation of . . . conflicting evidence on the issue of legal insanity is [within] the province of the finder of fact").

Finally, the defendant argues the court unreasonably rejected Meisler's expert conclusion that the defendant lacked substantial capacity to control his conduct within the requirements of the law. The defendant also argues the trial court "gave no reason to discount [Meisler's] assessment based on his professional experience." We disagree.

In its oral memorandum of decision, the court explicated that it was unpersuaded by Meisler's testimony because "both the consistency and the basis" of his conclusions were unreliable. The court also found that Meisler's testimony at trial differed from his prior reports regarding the underlying bases of his opinion. As discussed, in a trial to the court, the court acts as the fact finder to "consider, sift and weigh all the evidence including a determination as to whether any opinions given concerning the defendant's sanity were undercut or attenuated under all the circumstances." (Internal quotation marks omitted.) *State* v. *Quinet*, supra, 253 Conn. 408. We conclude that the court properly considered, sifted, and weighed the evidence in its findings.[14]

Our review of the record leads us to conclude that the court's decision was based on the court's reasonable assessment of the evidence presented. The court identified and analyzed evidence relating to Meisler's opinion that tended to suggest it was unconvincing. Also, the court found that Meisler "appear[ed] to dismiss [differing analyses of the defendant] as just another opinion." Further, the court was convinced that the state undermined Meisler's testimony through its cross-examination.[15]

We note that in *Quinet*, our Supreme Court acknowledged that evidence suggesting a defendant had the mental capacity to plan or organize a crime "is relevant to a determination of whether the accused has the capability of conforming his conduct to the requirements of the law." *State* v. *Quinet*, supra, 253 Conn. 253 Conn. 410. Further, behavior that conforms within legal requirements "depends upon the specific facts and circumstances of the case, and ultimately is a determination for the trier of fact." Id. Here, evidence was presented at trial that suggested the defendant did not lack substantial capacity to conform his conduct within the requirements of the law.[16] In our view, the court reasonably and thoroughly articulated its reasoning and was under no obligation to accept Meisler's testimony.

We find that the court's findings of fact were reasonably supported by the evidence. Thus, the defendant

failed to meet his burden of establishing that the court's rejection of the affirmative defense of mental disease or defect was not reasonably supported by the evidence.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 53a-49 (a) (2) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another, he causes the death of such person . . . ."

[3] General Statutes § 53-21 (a) (1) provides in relevant part: "Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child . . . ."

[4] The affirmative defense of mental disease or defect is codified under General Statutes § 53a-13 (a) and provides in relevant part: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[5] In accordance with our policy of protecting the privacy interests of the victims of the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[6] Evidence was presented to the court that suggested the defendant had requested to live in T.C.'s home the week prior to the crime, but was told he could not.

[7] The child spent the night in T.C.'s bedroom.

[8] The court found that during the night, the defendant "made a passing remark about . . . sleeping in [T.C.'s] bed with her which [T.C.] responded—no you're not."

[9] T.C. believed that the hammer the defendant used was one she regularly kept inside a closet; it was missing after the incident.

[10] The record is unclear regarding the child's whereabouts during the defendant's pursuit of T.C.

[11] The defendant conceded at oral argument before this court that a claim under the cognitive prong of the mental disease or defect affirmative defense is not at issue. His claim is limited to the volitional prong of that test; that he lacked substantial capacity to control his conduct within the requirements of the law.

[12] Meisler used several psychological testing procedures, including the MMPI2-RF and the Rorschach Ink Blot test. The results of the MMPI2-RF were not "interpretable in the conventional way" because the defendant endorsed too many distressing symptoms and Meisler could not objectively compute the results. The Rorschach Ink Blot test indicated the defendant's "inability to manage emotions, cope with reality, and essentially stay sane when faced with emotional stress or turmoil."

[13] The affirmative defense of mental disease or defect is unavailable "if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof, unless such drug was prescribed for the defendant by a prescribing practitioner, as defined in subdivision (22) of section 20-571, and was used in accordance with the directions of such prescription." General Statutes § 53a-13 (b). The court here made no findings as to either voluntary intoxication or proximate cause.

[14] In reaching its conclusion, the court identified several inconsistencies relating to Meisler's testimony including: (1) the "self-reported [mental health history] from [the defendant] and [that he] doesn't recall hearing auditory hallucinations at the time" of the assault; (2) the initial March, 2014 report drafted by Meisler which conflicted with his testimony at trial; (3) Meisler's prior opinion that alcohol and/or prescription drugs were a contributing factor; and (4) Yergen's observation that the defendant was changing his

story regarding hearing voices.

[15] The court stated that it found "the state has successfully undermine[d] the basis for his opinion."

[16] "The court took into consideration that the defendant went to the first floor to find a hammer and that was inside the box . . . stating to [the victim that] he's going to kill . . . [her]; follow[ed] her out of the room [and] pushe[d] her down the stairs . . . continue[d] to strike her; [threw] the hammer downstairs outside of the unit; ha[d] footwear on; recognize[d] police officer[s] [and] response[d] appropriately [and was] compliant with the police officer."

———————————————————