******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
GREGORY L. WEATHERS
(AC 41291)

Keller, Prescott and Harper, Js.

*Syllabus*

Convicted by a three judge panel of the crimes of murder, criminal possession
of a pistol or revolver, and carrying a pistol without a permit, the defen-
dant appealed. The defendant's conviction stemmed from his conduct
in approaching the victim in a construction site and shooting the victim,
who died from the gunshot wounds. Following the shooting, the defen-
dant told police he shot the victim to settle a labor dispute. During his
police interview, the defendant stated he was looking for a job and
felt that the victim had brushed him aside. The defendant asserted an
affirmative defense of not guilty by reason of mental disease or defect
and presented the testimony of two expert witnesses, L and A. L testified
that at the time of the offense the defendant was suffering from a
psychotic disturbance that influenced his thinking and behavior, and
that the defendant had reported that on the morning of the offense he
experienced auditory hallucinations, delusions and suicidal thinking,
including a hallucination of flashing lights conveying to him that the
victim was dangerous and that the defendant should shoot him. L also
surmised that a psychiatrist at the Department of Correction who had
suspected that the defendant may have been exaggerating or fabricating
his symptoms likely had not reviewed the defendant's hospital records
wherein he was diagnosed with a psychosis, or conducted any collateral
interviews. A testified that the sum of the evidence provided a sufficient
basis to conclude that the defendant lacked substantial capacity to
control his conduct at the time of the offense. *Held*:

1. The defendant could not prevail in his claim that the trial court's rejection
   of his affirmative defense of mental disease or defect was not reasonably
   supported by the evidence:

   a. The defendant's claim that the court arbitrarily rejected the opinions
   of his experts that he lacked substantial capacity to control his conduct
   within the requirements of the law was unavailing: that court's decision
   was based on its reasonable assessment of the evidence presented, as
   the court did not merely find that the defendant had failed to prove that
   he lacked substantial capacity to control his conduct as a result of his
   psychosis but, rather, found that the defendant was acting under the
   influence of a multitude of stressful and emotional hurdles in his life
   not of a psychiatric nature, and, therefore, the court, as the finder
   of fact, was entitled to adopt that nonpsychiatric explanation for the
   defendant's conduct and reject the expert opinions; moreover, given
   the experts' reliance on the defendant's own account of his symptoms
   and the events surrounding the shooting, it was reasonable for the court
   to conclude that their opinions were undermined by its finding that the
   defendant intentionally had either embellished or fabricated psychiatric
   symptoms over time, and although L credited the defendant's explana-
   tion that the victim was dangerous and should be shot, the court found
   that the defendant shot the victim because he felt brushed aside after
   inquiring about employmnet opportunities, not because he was laboring
   under any delusional beliefs, and it reasonably could have found that
   evidence pertaining to L's understanding of the statutory insanity test
   undermined the value of his opinions; furthermore, the court reasonably
   could have found that A failed to account adequately for the defendant's
   statements to police after the shooting that he shot the victim to settle
   a perceived labor dispute, and in light of the weight that A placed on
   the seemingly enigmatic nature of the shooting, the court reasonably
   could have found A's conclusion to be attenuated.

   b. The trial court findings that the defendant shot the victim out of
   frustration and anger, that there was nothing unremarkable, untoward,
   or aberrant about the defendant's conduct during his police interview
   and that the defendant either fabricated or embellished his symptoms
   were not clearly erroneous and were supported by evidence in the

record: given the defendant's preexisting anxiety and depression regarding his unemployment, his perception of the victim's response as a slight, his characterization of their interaction as a dispute, and his admission that he shot the victim to settle this dispute, the court could have found that it was that perceived slight, as opposed to a psychotic delusion or hallucination, that prompted the defendant to shoot the victim, and the fact that there was no direct evidence that the defendant was visibly angry did not render the finding that he shot the victim out of frustration clearly erroneous; moreover, although, during the police interview, there were numerous instances in which the defendant failed to answer the questions asked or gave an unresponsive answer, and some of his statements could be characterized as disorganized, it is not uncommon for defendants to not be entirely responsive during a police interview and to be reticent to respond to police questioning, and inattention and confusion are not necessarily indicative of a mental disease or defect; furthermore, the defendant conceded that there was evidence of malingering in the record, namely, a psychiatrist's notations in his medical records and A's conclusion in his written evaluation, and his claim that a fact finder could not reasonably infer his mental condition at the time of the offense from evidence of his mental condition at a subsequent time was unavailing, as a defendant's state of mind may be proven by his conduct before, during, and after the offense.

2. The defendant's claim that the trial court erred as a matter of law in rendering an opinion on a matter that required expert testimony was unavailing; although expert testimony is of assistance, the ultimate issue of sanity, including intent, is decided by the trier of fact, and if expert testimony was required, there was expert testimony to support the court's conclusion that although the defendant was suffering from a psychosis at the time of the shooting, such psychosis did not impair his capacity to control his conduct within the requirements of the law, as both expert witnesses testified that a psychosis does not necessarily impair an individual's capacity to substantially control his conduct within the requirements of the law, and, therefore, the court reasonably could have concluded as it did.

Argued September 20, 2018—officially released March 19, 2019

*Procedural History*

Information charging the defendant with the crimes of murder, criminal possession of a pistol or revolver, stealing a firearm, and carrying a pistol without a permit, brought to the Superior Court in the judicial district of Fairfield and tried to a three judge court, *Kavanewsky, Pavia and E. Richards, Js.*; thereafter, the state entered a nolle prosequi as to the charge of stealing a firearm; judgment of guilty, from which the defendant appealed. *Affirmed.*

*Dina S. Fisher*, assigned counsel, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Emily D. Trudeau*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Gregory L. Weathers, appeals[1] from the judgment of conviction, rendered after a trial by a three judge court,[2] of murder in violation of General Statutes § 53a-54a (a), criminal possession of a pistol or revolver in violation of General Statutes § 53a-217c (a) (1), and carrying a pistol without a permit in violation of General Statutes § 29-35 (a). On appeal, the defendant claims that (1) the trial court's rejection of his affirmative defense of mental disease or defect was not reasonably supported by the evidence and (2) the court erred as a matter of law in deciding an issue without the aid of expert testimony. We disagree and, accordingly, affirm the judgment of the trial court.

The court reasonably could have found the following facts from the evidence presented at trial.[3] On the morning of March 26, 2015, the victim, Jose Araujo, and several other individuals employed by Burns Construction were installing an underground gas main on Pond Street in Bridgeport. Fernando Oquendo, a patrolman with the Bridgeport Police Department, was working overtime duty at the construction site and had blocked off Pond Street near Chopsey Hill Road.[4] Around the time in question, Officer Oquendo had gone to retrieve coffee for the construction crew, who were in the process of backfilling a trench that had been dug along the side of the road. Matthew Girdzis, one of the crew members, was seated in a dump truck positioned near the trench. The victim was standing on the driver's side of the truck speaking with Girdzis about where they should dump the fill material.

While the victim and Girdzis were talking, the defendant walked into the work zone and approached the victim. Girdzis had never seen the defendant there before; he was not an employee of Burns Construction. The defendant greeted the victim with a seemingly amicable "fist bump" and asked the victim whether the construction company was hiring. The victim, in turn, relayed the question to Girdzis. Speaking to the defendant directly, Girdzis suggested that he go to the construction company's office downtown to fill out an application and "see what happens." By all accounts, there was nothing unusual or remarkable about the defendant's demeanor during his initial interaction with the victim and Girdzis.[5] There was nothing to suggest that any sort of argument or altercation ensued or that the defendant harbored any animosity toward the victim or Girdzis. The defendant did not appear to be acting strangely; he appeared to be rational and to understand what was being said.

Following this encounter, the defendant walked away, seemingly leaving the work zone, but, in fact, he merely walked around to the other side of the truck and stood near the passenger side door. Meanwhile,

Girdzis and the victim had begun walking toward the trench. After a few seconds, the defendant looked up and down the street and, seeing the street empty, proceeded to walk back around the truck and reapproach the victim. In a matter of seconds, the defendant, without saying a word, removed a revolver from his pocket and shot the victim several times. The victim ultimately died from gunshot wounds.

Immediately after the shooting, the defendant began running up the street, zig-zagging across it several times. Several of the victim's coworkers chased the defendant on foot. The defendant, seeing that he was being pursued, stopped momentarily at a parked pickup truck and opened its door but then quickly shut it again and resumed running up the street. The coworkers continued chasing the defendant until he ran in between two houses.

Members of the Bridgeport Police Department soon arrived on the scene and began canvassing the area. The defendant eventually was located by Officer Darryl Wilson, who found the defendant hiding in some tall bushes in a backyard. Wilson ordered the defendant to show his hands, at which point the defendant began to run. Wilson ordered the defendant to stop and again demanded that he show his hands. The defendant complied. Upon observing the revolver in the defendant's hand, Wilson ordered the defendant several times to drop the weapon and warned the defendant that he was prepared to shoot if the defendant did not comply. After repeating this order, the defendant dropped his weapon. Additional police units arrived a few seconds later, and the defendant was arrested. As he was being arrested, the defendant mumbled something to the effect of, "it's all messed up" or "I messed up."

Following his arrest, the defendant was led out from behind the house and into the street, at which point Lieutenant Christopher LaMaine heard the defendant state spontaneously that he had been involved in a "labor dispute." When approached by LaMaine, the defendant again claimed that there had been a "labor dispute." After advising the defendant of his constitutional rights, which the defendant waived, LaMaine questioned him. The defendant seemed to have difficulty focusing, putting his thoughts together, and answering LaMaine's questions fully, and, at times, he rambled on incoherently, causing LaMaine to suspect that the defendant either had a mental illness or was under the influence of phencyclidine (PCP). Upon further questioning, the defendant stated that the victim was a foreman and was not "letting anyone out here work" and that he had shot the victim to settle this dispute.

The defendant subsequently was transported to the police station, where he was interviewed by Detective Paul Ortiz and another detective.[6] As Ortiz observed,

there were numerous instances throughout the interview where the defendant either entirely failed to respond to questions or gave less than responsive answers, and some of his statements seemed disorganized. Given his interactions with the defendant, Ortiz thought it was appropriate to have him evaluated at a hospital for possible mental health or drug problems. Nevertheless, the defendant appeared to understand the detectives' questions. He admitted to shooting the victim and expressed remorse for it. He stated that he had been looking for a job and felt that the victim had "brushed [him] off." Following the interview, the defendant was transported to Bridgeport Hospital for evaluation and, the next day, was remanded to the custody of the Commissioner of Correction. Additional facts will be set forth as necessary.

The defendant subsequently was charged with, inter alia,[7] murder, criminal possession of a firearm, and carrying a pistol without a permit. The defendant elected to be tried by a three judge court and raised the affirmative defense of mental disease or defect pursuant to General Statutes § 53a-13 (a), otherwise known as the insanity defense. "This defense has both a cognitive and a volitional prong. . . . Under the cognitive prong [of the insanity defense], a person is considered legally insane if, as a result of mental disease or defect, he lacks substantial capacity . . . to appreciate the . . . [wrongfulness] of his conduct. . . . Under the volitional prong, a person also would be considered legally insane if he lacks substantial capacity . . . to [control] his conduct to the requirements of law." (Citation omitted; internal quotation marks omitted.) *Porter* v. *Commissioner of Correction*, 120 Conn. App. 437, 449–50 n.17, 991 A.2d 720, cert. denied, 298 Conn. 901, 3 A.3d 71 (2010). The matter subsequently was tried to the court over the course of two days.

In its oral decision, the court rejected the defendant's insanity defense and found him guilty of the charged offenses. With respect to the insanity defense, the court found that there was credible evidence that the defendant did suffer from a mental disease or defect, specifically, psychosis of an unspecific nature. Nevertheless, the court determined that the defendant had failed to establish that, as a result of his psychosis, he lacked substantial capacity to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

With regard to the volitional prong in particular—the only prong at issue in this appeal—the court found that "the defendant's mental disease did not diminish his ability to conform his behavior. The defendant's actions in shooting [the victim] were not borne out of his psychosis. Simply put, he was acting out of frustration and anger. The defendant was faced with a multitude of stressful and emotional hurdles in his life not of a psy-

chiatric nature which motivated his actions that day. . . . The evidence suggests that he made overtures for a job, and when he was directed to make an application elsewhere, he felt rebuffed and in his own words, felt that he had been brushed off." The court further found that the defendant had obeyed police commands and that "there was nothing remarkable, untoward or aberrant about the defendant's conduct" during the police interview.[8] On the basis of these findings, the court determined that "the credible evidence [did] not support a finding that as a result of his mental disease, the defendant lacked the substantial capacity to control his conduct within the requirements of the law." The court rendered judgment accordingly and sentenced the defendant to a total effective term of imprisonment of forty-five years. This appeal followed.

I

On appeal, the defendant first claims that the court's rejection of his affirmative defense of mental disease or defect was not reasonably supported by the evidence. He argues that the court improperly rejected his expert witnesses' conclusions that he lacked substantial capacity to conform his conduct within the law. He further argues that the court made certain clearly erroneous findings of fact.[9] We disagree.

As an initial matter, we set forth our standard of review. "The evaluation of . . . evidence on the issue of legal insanity is [within] the province of the finder of fact . . . . We have repeatedly stated that our review of the conclusions of the trier of fact . . . is limited. . . . This court will construe the evidence in the light most favorable to sustaining the trial court's [judgment] and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. . . . The probative force of direct and circumstantial evidence is the same. . . . The credibility of expert witnesses and the weight to be given to their testimony and to that of lay witnesses on the issue of sanity is determined by the trier of fact. . . .

"The affirmative defense of mental disease or defect is codified in . . . § 53a-13 (a) and provides that [i]n any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law. Whereas an *affirmative defense* requires the defendant to establish his claim by a preponderance of the evidence, a properly raised *defense* places the burden on the state to disprove the defendant's claim beyond a reasonable doubt." (Citation omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State v. Campbell*, 169 Conn. App. 156, 161–62, 149 A.3d 1007,

cert. denied, 324 Conn. 902, 151 A.3d 1288 (2016).[10]

To the extent that the defendant challenges the court's factual determinations, "[o]ur review . . . is limited to whether those findings are clearly erroneous. . . . A court's finding of fact is clearly erroneous and its conclusions drawn from that finding lack sufficient evidence when there is *no evidence in the record* to support it or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; emphasis added; internal quotation marks omitted.) *State* v. *Altayeb*, 126 Conn. App. 383, 387–88, 11 A.3d 1122, cert. denied, 300 Conn. 927, 15 A.3d 628 (2011).

The following additional facts are relevant to this issue. In support of his affirmative defense, the defendant presented the testimony of two expert witnesses, David Lovejoy and Paul Amble, both of whom produced written evaluations that were admitted into evidence.[11] Lovejoy, a board certified neuropsychologist hired by the defense, examined the defendant on three separate occasions in July, September, and November, 2015. Lovejoy also reviewed a variety of records, conducted interviews with the defendant's wife and two of his friends, and watched the video recording of the police interview.

According to Lovejoy, the defendant and his wife reported that in the two years leading up to the offense, the defendant had been experiencing multiple ongoing stressors. Lovejoy's evaluation revealed that the defendant had lost his job as a truck driver in 2013 and that he had remained unemployed thereafter, despite continuing efforts to secure employment. Following the loss of his job, the defendant began drinking heavily, which resulted in criminal charges for operating a motor vehicle while under the influence of intoxicating liquor or drugs. In January, 2015, the defendant, aware that there was a warrant out for his arrest in connection with these charges, turned himself in to authorities. The defendant remained in prison until his wife was able to secure a bail bond in March, 2015—shortly before the offense in question took place. According to the defendant's representations to Lovejoy, after his release from prison, he began to worry about his family's finances and, over time, started to "feel crazy" and experience thoughts of suicide. (Internal quotation marks omitted.)

According to Lovejoy, "[i]nformation collected during the clinical interviews with [the defendant] and the collateral interviews with his wife and friends indicated that [the defendant] began to decompensate psychiatrically, beginning on [March 22 or 23, 2015]. Strange behaviors, disrupted sleep, ruminative pacing, tangential and confused thinking, and moments of appearing 'spaced out' were observed by those who were with

him." The defendant's wife also indicated to Lovejoy that she had observed the defendant begin to espouse paranoid thoughts related to a belief that she wanted to hurt or kill him.

Regarding the defendant's conduct and state of mind later that week, Lovejoy's interviews with the defendant revealed that "[b]y the evening [before and/or morning of the offense, the defendant] appeared to be under the influence of strong beliefs that were not based in reality (delusions)." More specifically, the defendant reported to Lovejoy that he had begun to believe that he was receiving messages via flashing lights emanating out of his computer screen. In Lovejoy's view, "[t]hese beliefs had become a prominent part of [the defendant's] clinical presentation, at that time." The defendant also reported to Lovejoy that he had begun to hear voices that made critical comments about him. He described these voices as sounding like "me talking to myself from the inside." (Internal quotation marks omitted.) The defendant further represented to Lovejoy that, by the night before the offense, he had resolved to kill himself because he "was tired of trying to get [his] thoughts together and . . . wanted the voices to go away," but he decided against doing it at that time because he did not want his wife and daughter to have to find his body in the house. (Internal quotation marks omitted.)

Lovejoy's interviews with the defendant further revealed that, by the morning of the offense, "auditory hallucinations, delusions and suicidal thinking were present and appeared to be overarching influences on [the defendant's] thinking and behavior." More specifically, the defendant reported to Lovejoy that, on the morning of the offense, he had believed that the flashing lights from his computer screen were sending him a message indicating, "[g]et your gun. You are worthless and others are evil." (Internal quotation marks omitted.) The defendant reported that the message also had indicated that he would receive additional messages from lights outside of his home. The defendant reported that, by this point, he had decided to kill himself at a local cemetery. He further reported, however, that he came upon a construction site displaying a range of colored lights that were flashing at him and that these lights and the voices inside of him told him to stop. According to the defendant, a person at the construction site fixed his eyes on him and then looked to another man with "an evil intent," at which time the lights conveyed to the defendant that this person was dangerous and that he should shoot him.

In addition to interviewing the defendant and collateral sources, Lovejoy also reviewed the defendant's medical records from after the offense. Regarding the defendant's Bridgeport Hospital records, which were admitted into evidence at trial, Lovejoy noted that men-

tal health experts there had diagnosed him with "psychosis not otherwise specified" and that his Global Assessment of Functioning score indicated "the presence of very severe psychiatric symptoms and associated functional impairments." Lovejoy further noted that the hospital records described a number of symptoms consistent with a thought disorder, including tangential thinking, thought blocking, confused and disorganized thinking, the inaccurate interpretation of reality, suspicious and paranoid thinking, difficulty following conversations and responding to questions, a poverty of speech, and impaired impulse control. The defendant also was observed to be internally preoccupied and staring suspiciously. Regarding the defendant's medical records from the Department of Correction (department), Lovejoy testified that they were largely, but not entirely, consistent with the hospital records.[12] Lovejoy testified that, early on in the defendant's treatment at the department, a psychiatrist, Allison Downer, had suspected that the defendant may have been exaggerating or fabricating his mental health symptoms.[13] Lovejoy surmised, however, that Downer likely had not reviewed the defendant's hospital records nor conducted any collateral interviews.

Finally, as part of his evaluation, Lovejoy also conducted psychological and neuropsychological testing on the defendant. Lovejoy testified that this testing gave no indication that the defendant had been exaggerating his cognitive complaints or had been attempting to fabricate or exaggerate his psychiatric symptoms. According to Lovejoy, the testing revealed the presence of likely delusions, auditory hallucinations, and a tendency to experience confused thinking, which was consistent with the defendant's self-report of his psychological and psychiatric symptoms.

On the basis of the foregoing information, Lovejoy testified that his overall opinion was that, at the time of the offense, the defendant had been suffering from a psychotic disturbance that significantly influenced his thinking and behavior, although he was not able to arrive at any specific diagnosis for the defendant. Although he did not opine in his written evaluation as to whether this psychotic disturbance had impacted the defendant's ability to conform his conduct to the law, upon questioning by defense counsel, Lovejoy testified that the defendant's "psychotic disorder did impact him in that way."

Amble, a board certified forensic psychiatrist hired by the state, also testified for the defense. Amble evaluated the defendant for three and one-half hours in April, 2016. Amble reviewed the same reports, records, and video recording reviewed by Lovejoy and interviewed the same collateral sources. He also reviewed Lovejoy's written evaluation.

Amble testified that the information he obtained dur-

ing his interviews with the collateral sources was consistent with that reported by Lovejoy. The defendant's account of his symptoms and the circumstances surrounding the offense, as reported in Amble's written evaluation, were also generally consistent with that provided to Lovejoy, but it also included some additional information. Regarding his auditory hallucinations, the defendant reported to Amble that he had first begun to hear voices while still incarcerated on the operating a motor vehicle while under the influence charges. He also reported that these voices had indicated to him on multiple occasions that he should kill himself, and on the morning of the offense he heard his own voice confirming the plan. The defendant further reported that, in addition to the auditory hallucinations, he also had experienced visual hallucinations in the form of his deceased father. Most notably, upon questioning by Amble as to what exactly had prompted him to shoot the victim,[14] the defendant reported that, at the time of the offense, he had perceived himself to be possessed by a demon and that, afterward, he had continued to be possessed until "people in jail prayed over [him] and release[d] the demon." (Internal quotation marks omitted.)

On the basis of his review of the records, Amble concluded that the department's diagnosis of psychosis not otherwise specified was reasonable, although he was likewise unable to make his own diagnosis. As to the defendant's insanity defense, Amble testified that his overall opinion was that, at the time of the offense, the defendant "had some impairments in his ability to conform his conduct to the law." As Amble explained in more detail in his written evaluation, however, there were several pieces of countervailing information that militated against the veracity of the defendant's claim of insanity.

First, Amble noted that the defendant had failed to share with anyone, including Lovejoy, that he was having severe visual hallucinations and auditory hallucinations while incarcerated prior to the offense. Second, the defendant had never before claimed to have been possessed by a demon until after repeated questioning by Amble. Amble opined that these two pieces of information, taken together, strongly suggested the possibility that the defendant was embellishing his psychiatric symptoms and was providing a malingered explanation for why he shot the victim. Third, the mental health evaluations by Downer at the department drew clear conclusions that the defendant was fabricating symptoms of a mental illness. Fourth, the defendant's account of his symptoms was not typical for individuals with a psychotic illness. Specifically, Amble stated that it was atypical for an individual to experience auditory hallucinations in one's own voice and to experience visual hallucinations as distinctive as those described by the defendant. Finally, Amble raised doubts about

the claimed impulsivity of the shooting. He found it curious that, although the defendant purportedly had experienced auditory hallucinations telling him to kill himself on numerous occasions and had intended to do so on the day of the offense, the single hallucination at the construction site was enough to cause him to change his plans and kill somebody else.

Ultimately, Amble concluded that, despite these countervailing considerations, "the sum of the evidence, including reports of the defendant's spouse and friends, the illogical nature of the act, the lack of primary gain, and mental health assessments immediately after the crime concluding that he was suffering from a psychiatric illness, provide[s] a sufficient basis to conclude that the defendant lacked substantial capacity to control his conduct at the time of his crime." In response to questioning by the court, Amble clarified that his conclusion was "[t]o some extent based on [the defendant's own] report" but also noted that the collateral information was "very important." He also attributed moderate weight to what he described as the seemingly illogical, senseless nature of the shooting.

In rebuttal to the defendant's insanity defense, the state relied on its cross-examination of the defendant's two experts and the evidence adduced in its case-in-chief. A significant portion of the state's cross-examinations was focused on the possibility that the defendant's mental state had been caused by the use of PCP or "bath salts."[15] See General Statutes § 53a-13 (b) ("[i]t shall not be a defense under this section if such mental disease or defect was proximately caused by the voluntary ingestion, inhalation or injection of intoxicating liquor or any drug or substance, or any combination thereof"). Nevertheless, the state also challenged the experts' conclusions regarding the defendant's ability to control his conduct. On cross-examination, Lovejoy conceded that not all people who suffer from psychotic symptoms lose the ability to control their conduct within the requirements of the law and that the majority of people who suffer from some sort of psychosis do not come into contact with the law. Regarding his familiarity with the meaning of the statutory insanity defense, Lovejoy acknowledged that it was "difficult for [him] to separate conceptually in [his] head" the cognitive and volitional prongs because "[f]or [him] the notion of understanding the wrongfulness of your action and the notion of being in control of your actions when you are separated from reality are somewhat intertwined . . . ." Lovejoy agreed that this was "sort of a philosophical difference from the way the law is written."

Amble likewise conceded on cross-examination that a psychosis does not necessarily impair a person's ability to control his or her conduct within the requirements of the law and that the majority of people experiencing their first episode of psychosis do not commit violent

acts. Amble further conceded that the fact that a crime is poorly thought out does not necessarily indicate that it is a product of psychosis. Similarly, Amble agreed that the fact that someone may have reacted violently to an apparently minor slight does not necessarily indicate that he was operating under the influence of a psychosis. Moreover, in response to questioning by the court, Amble agreed that people who act illogically and commit illogical acts are not necessarily unable to conform their behavior to the requirements of the law. He also acknowledged that there was some evidence that the defendant had "mention[ed] something about a labor dispute at the time of his arrest" but stated that, from the information that Amble had, this "didn't seem to make sense."[16]

## A

The defendant first argues that the court arbitrarily rejected Lovejoy and Amble's expert opinions that the defendant lacked substantial capacity to control his conduct within the requirements of the law. According to the defendant, there was no conflicting evidence adduced at trial to undermine the experts' opinions, and, thus, the court had an insufficient basis to reject them. We disagree.

Preliminarily, we set forth the standard for reviewing a fact finder's rejection of expert testimony. "It is well established that [i]n a case tried before a court, the [panel of judges] is the sole arbiter of the credibility of the witnesses and the weight to be given specific testimony. . . . The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible. . . . On appeal, we do not retry the facts or pass on the credibility of witnesses." (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 169 Conn. App. 165. "The trier may not, however, arbitrarily disregard, disbelieve or reject an expert's testimony in the first instance. . . . There are times . . . that the [fact finder], despite his superior vantage point, has erred in his assessment of the testimony. . . . Where the [panel] rejects the testimony of a plaintiff's expert, there must be some basis in the record to support the conclusion that the evidence of the [expert witness] is unworthy of belief." (Internal quotation marks omitted.) *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 244, 963 A.2d 943 (2009).

"[I]n its consideration of the testimony of an expert witness, the [fact finder] might weigh, as it sees fit, the expert's expertise, his opportunity to observe the defendant and to form an opinion, and his thoroughness. It might consider also the reasonableness of his judgments about the underlying facts and of the conclusions which he drew from them. . . . [T]he [fact finder] can disbelieve any or all of the evidence on insanity and can construe that evidence in a manner different

from the parties' assertions. . . . It is the trier of fact's function to consider, sift and weigh all the evidence including a determination as to whether any opinions given concerning the defendant's sanity were undercut or attenuated under all the circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Campbell*, supra, 169 Conn. App. 165; see also *State* v. *Cobb*, 251 Conn. 285, 490, 743 A.2d 1 (1999) ("the state can weaken the force of the defendant's presentation by cross-examination and by pointing to inconsistencies in the evidence" [internal quotation marks omitted]), cert. denied, 531 U.S. 841, 121 S. Ct. 106, 148 L. Ed. 2d 64 (2000). "The fact, therefore, that both of the defendant's expert witnesses supported his claim of insanity while the state chose to call no expert witnesses, but rather principally relied on cross-examination of the defendant's expert witnesses, does not require a determination that the trier of fact reasonably could not have concluded that the defendant had failed to prove insanity by the required standard." *State* v. *DeJesus*, 236 Conn. 189, 201, 672 A.2d 488 (1996).

In its oral decision, the court explicated that it was unpersuaded by the experts' testimony because it found that the defendant had (1) "had a perceived motivation, a reason, to commit these crimes," i.e., to seek retribution for having been "brushed off"; (2) obeyed police commands immediately after the shooting and behaved appropriately in the subsequent police interview; and (3) "willingly either fabricated or embellished his symptoms selectively over time."[17] As discussed, in a trial to the court, the court acts as the fact finder to "consider, sift and weigh all the evidence including a determination as to whether any opinions given concerning the defendant's sanity were undercut or attenuated under all the circumstances." (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 169 Conn. App. 167. We conclude that the court properly considered, sifted, and weighed the evidence.

Our review of the record leads us to conclude that the court's decision was based on its reasonable assessment of the evidence presented. Preliminarily, we note that the court did not merely find that the defendant had failed to prove that he lacked substantial capacity to control his conduct as a result of his psychosis. The court also found that the defendant had been acting under the influence of "a multitude of stressful and emotional hurdles in his life *not of a psychiatric nature*," and, thus, it affirmatively found that "the defendant's mental disease did not diminish his ability to conform his behavior." (Emphasis added.).[18] This conclusion directly conflicts with Lovejoy and Amble's opinions. Therefore, the court, as the finder of fact, was entitled to adopt this nonpsychiatric explanation for the defendant's conduct and, accordingly, to reject the expert opinions. Moreover, given the experts' reliance on the defendant's own account of his symptoms and

the events surrounding the shooting, it was reasonable for the court to conclude that the experts' opinions were undermined by the court's finding that the defendant intentionally had either embellished or fabricated psychiatric symptoms over time. See *State* v. *Patterson*, 229 Conn. 328, 338, 641 A.2d 123 (1994) (trial court reasonably rejected expert opinion because opinion was based on "generally self-serving interview statements of the defendant and his family members"); *State* v. *Medina*, 228 Conn. 281, 310, 636 A.2d 351 (1994) (because state elicited on cross-examination of defendant's experts that state medical personnel had concluded that defendant was malingerer who did not suffer from serious mental illness, jury was free to credit such conclusion and reject expert testimony).

With respect to Lovejoy in particular, the court reasonably could have found his opinion to be unworthy of belief due to inconsistencies in the defendant's version of events.[19] It is clear from his testimony and written evaluation that Lovejoy credited and viewed as significant the defendant's explanation that he had shot the victim because of a delusional belief that the victim was dangerous and should be shot. The court, however, found that the defendant had shot the victim because he felt brushed aside after inquiring about employment opportunities—not because he was laboring under any delusional beliefs. If an expert's opinion of the defendant's mental state at the time of the offense is based in part on information obtained from the defendant himself during the expert's interview with him, the fact finder may reasonably discredit this opinion if it finds the defendant's account to the expert to be inconsistent with other evidence adduced at trial. See *State* v. *Cannon*, 165 Conn. App. 324, 337, 138 A.3d 1139 ("the inconsistencies in the defendant's [trial] testimony further weakened [the expert's] . . . assessment of the defendant's state of mind because [the expert's] opinion, developed by interviewing the defendant, relied on the assumption that the defendant's version of events was accurate"), cert. denied, 321 Conn. 924, 138 A.3d 285 (2016); see also *State* v. *Crespo*, 246 Conn. 665, 680–81, 718 A.2d 925 (1998) (because expert opined that defendant had been suffering from disorder characterized by tendency to be unable to remember events and that this disorder rendered him unable to control his anger in highly stressful situations, trial court reasonably could have discredited expert opinion because court was entitled to disbelieve defendant when he told expert that he could not remember killing victim), cert. denied, 525 U.S. 1125, 119 S. Ct. 911, 142 L. Ed. 2d 909 (1999); *State* v. *Steiger*, 218 Conn. 349, 381–83, 590 A.2d 408 (1991) (court's rejection of defendant's insanity defense was supported in part by evidence from which trial court reasonably could have determined that at time of offense defendant was not, as he had claimed during interview with expert, in delusional state in which he

thought victims were terrorists).

The court also reasonably could have found that the evidence pertaining to Lovejoy's understanding of the statutory insanity test undermined the value of his opinion. As Lovejoy himself acknowledged, he found it difficult to distinguish between the cognitive and volitional prongs of the test. This difficulty appears to be borne out in his written evaluation, in which he opined that the defendant's psychosis had impaired the defendant's capacity to appreciate the wrongfulness of his conduct but made absolutely no mention of the defendant's capacity to *control* his conduct. It was not until Lovejoy explicitly was asked at trial to opine on the volitional aspect of the affirmative defense that he offered an opinion. Given the conclusory nature of this opinion, his failure to offer such opinion in his written evaluation, and his apparent misapprehension of the distinction between the two prongs of the affirmative defense, the court reasonably could have found Lovejoy's opinion to be unpersuasive.

With respect to Amble, the court reasonably could have found that he had failed to account adequately for the defendant's statements to police immediately after the shooting. As indicated in his written evaluation, Amble found the defendant's reason for shooting the victim to be "a mystery" and relied on the apparent "randomness" and "illogical" nature of the shooting to conclude that the defendant lacked substantial capacity to control his conduct at the time of the offense. As Amble clarified at trial, he gave "moderate" weight to the seemingly senseless, illogical nature of the act. As previously noted, however, the defendant himself told police immediately after the shooting that the victim had not been "letting anyone out [there] work" and that he had shot the victim to settle a perceived "labor dispute." When confronted with this contradictory evidence at trial, Amble's only response was that the defendant's statements to police "didn't seem to make sense."

In light of the weight that Amble placed on the seemingly enigmatic nature of the shooting, the court reasonably could have found Amble's conclusion to be attenuated. See *State* v. *Patterson*, supra, 229 Conn. 338 (trial court's finding that experts had failed adequately to account for defendant's apparently premeditated attack on victim, his efforts thereafter to avoid detection and apprehension, and his calculated attempts to manipulate hospital staff supported court's conclusion that defendant had failed to meet burden of establishing insanity defense).

Because the court's rejection of Lovejoy's and Amble's expert opinions is reasonably supported by the court's findings of fact and the evidence adduced at trial, the defendant's first argument fails.[20]

B

The defendant also argues that some of the court's express subordinate findings of fact are clearly erroneous. Specifically, the defendant assigns as clearly erroneous the court's findings that (1) the defendant shot the victim out of "frustration and anger"; (2) "there was nothing unremarkable, untoward or aberrant about the defendant's conduct [in the police interview]"; and (3) the defendant either fabricated or embellished his symptoms over time. Because there is evidence in the record to support the court's factual findings and we are not left with the definite and firm conviction that a mistake has been made, we conclude that these findings are not clearly erroneous.

The defendant first contends that the court's finding that he shot the victim out of frustration and anger "is not supported by the testimony of any witness." In support of this argument, the defendant points out that, not only did none of the victim's coworkers testify that the defendant had appeared angry, their testimony suggested the opposite—that there was "nothing unusual" about the defendant's demeanor during his initial interaction with the victim and Girdzis and there did not appear to be any argument or altercation between the defendant and any of the victim's coworkers. The defendant also notes that it was Girdzis and not the victim who had directed the defendant to fill out an application at the construction company's office.

As to the defendant's state of mind in the period leading up to the offense, the defendant's wife reported to Lovejoy that, after losing his job in 2013, the defendant began on a downward emotional spiral characterized by significant depression and feelings of hopelessness about his future. She further reported that the defendant had become increasingly desperate for work in 2014 and that, upon his release from prison in March, 2015, he quickly became overwhelmed by financial pressures. The defendant's wife provided Amble with a similar account of the defendant's financial and emotional circumstances. Moreover, the defendant himself reported to Lovejoy that he had begun to worry about his family's finances and his failures in life upon leaving prison and that he had felt as though he had failed his family and was responsible for the stress in their lives. Similarly, Lovejoy testified that the defendant had reported experiencing significant financial distress related to his lack of employment, the potential foreclosure of his home, and his bail bond obligation. Given this evidence, it was reasonable for the court to find that the defendant had been facing a "multitude of stressful and emotional hurdles in his life not of a psychiatric nature . . . ."

After the offense, the defendant stated in his interview with Detective Ortiz that he had been out of work for more than a year and that, after approaching the victim and his coworkers looking for a job, "they sent

[him] to the office." When asked by Ortiz whether the victim had said anything that upset him, the defendant responded, "he did, he brushed me off." Similarly, Detective LaMaine testified that, immediately after being apprehended, the defendant had stated that the victim was not "letting anyone out here work" and that he had shot the victim to settle a "labor dispute."[21] Given the defendant's preexisting anxiety and depression regarding his prolonged unemployment, his perception of the victim's response as a slight, his characterization of their interaction as a dispute, and his admission that he shot the victim to settle this dispute, the court could have properly found that it was this perceived slight—as opposed to a psychotic delusion or hallucination—that prompted the defendant to shoot the victim. Consequently, it was reasonable for the court to find that "[t]he defendant's actions in shooting [the victim] were not borne out of his psychosis" and that he was simply "acting out of frustration and anger." The fact that there was no *direct* evidence that the defendant had been *visibly* angry does not render this finding clearly erroneous. See *Keeley* v. *Ayala*, 328 Conn. 393, 419–20, 179 A.3d 1249 (2018) ("[A] finding is not clearly erroneous merely because it relies on circumstantial evidence. . . . [T]riers of fact must often rely on circumstantial evidence and draw inferences from it. . . . Proof of a material fact by inference need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief in the probability of the existence of the material fact. . . . In short, the court, as fact finder, may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." [Citation omitted; internal quotation marks omitted.]). Nor does the possibility that the court might have reached a different conclusion, given that it was Girdzis who ultimately responded to the defendant's inquiry, render clearly erroneous the conclusion that the court did reach. See *Skakel* v. *State*, 295 Conn. 447, 543 n.11, 991 A.2d 414 (2010) ("[A]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, [they] examine the trial court's conclusion in order to determine whether it was legally correct and factually supported. . . . This distinction accords with [an appellate tribunal's] duty . . . to review, and not to retry, the proceedings of the trial court." [Internal quotation marks omitted.]); *State* v. *Barnes*, 27 Conn. App. 713, 723, 610 A.2d 689 (under clearly erroneous standard of review, "[t]he issue is not whether the trial court could have reached a different conclusion but whether the conclusion which it did reach is clearly erroneous" [internal quotation marks omitted]), cert. denied, 223 Conn. 914, 614 A.2d 826 (1992).

The defendant next challenges the court's finding that

"there was nothing remarkable, untoward or aberrant about the defendant's conduct [in the police interview]." In support of this contention, the defendant notes the extended periods of time during which he was unresponsive and asserts that he appeared distracted and confused during the interview. Because trial testimony and the video recording of the interview support the court's finding, we conclude that it is not clearly erroneous.[22]

As revealed by the video recording and conceded by Detective Ortiz, there were numerous instances during the course of the interview that the defendant either failed to answer the questions asked or gave an unresponsive answer, and some of his statements could rightly be characterized as disorganized. Ortiz also testified, however, that it is not uncommon for defendants to not be entirely responsive during an interview. Indeed, it is a matter of common knowledge that an individual involved in the commission of a serious offense might understandably be reticent to respond to police questioning; "[triers of fact] are not required to leave common sense at the courtroom door . . . nor are they expected to lay aside matters of common knowledge or their own observations and experience of the affairs of life . . . ." (Internal quotation marks omitted.) *State* v. *$7379.54 United States Currency*, 80 Conn. App. 471, 476, 844 A.2d 220 (2003). Common sense similarly dictates that inattention and confusion are not necessarily indicative of a mental disease or defect. Moreover, Amble testified that the defendant's unresponsiveness and blank gaze are "such . . . non-specific observation[s] that . . . [these] certainly could be [indicative of psychosis], *and then it might not be*; it all depends." (Emphasis added.) Given this evidence and the great deference we afford the trier of fact's findings in view of its function "to weigh and interpret the evidence before it"; (internal quotation marks omitted) *State* v. *Campbell*, 328 Conn. 444, 487, 180 A.3d 882 (2018); we cannot agree with the defendant's contention that "[n]o reasonable fact finder could view this interview and conclude that the defendant was not experiencing a mental breakdown of some sort at the time."

Finally, the defendant argues that the court's finding that he either fabricated or embellished his symptoms is clearly erroneous because the evidence on which the court based this finding "cannot reasonably be called substantial evidence." This argument clearly lacks merit. "Under the clearly erroneous standard of review, an appellate tribunal does not weigh the quantum of evidence submitted; it simply inquires as to whether there is *any evidence* in the record to support a given finding, or whether the tribunal otherwise is definitely and firmly convinced that a mistake has been made." (Emphasis added.) *Jalbert* v. *Mulligan*, 153 Conn. App. 124, 138, 101 A.3d 279, cert. denied, 315 Conn. 901, 104 A.3d 107 (2014). Moreover, "[p]roof of a material fact

by inference need not be so conclusive as to exclude every other hypothesis. It is sufficient if the evidence produces in the mind of the trier a reasonable belief that the material fact is more probable than not." (Internal quotation marks omitted.) *Patrick* v. *Burns*, 5 Conn. App. 663, 669–70, 502 A.2d 432 (1985), cert. denied, 198 Conn. 805, 504 A.2d 1059 (1986). Because the defendant concedes that there is some evidence of malingering in the record—namely, Downer's notations in the defendant's medical records with the department and Amble's conclusion in his written evaluation—we cannot conclude that the court's finding is clearly erroneous.

The defendant further argues that, even if this finding is not clearly erroneous, it does not logically support the court's conclusion that the defendant's psychosis did not diminish his ability to control his behavior. More specifically, the defendant contends that the fact that he was fabricating or exaggerating his symptoms *after* the offense "does not prove anything about [his] mental state *at the time of the shooting*." (Emphasis in original.) In other words, the defendant appears to be arguing that a fact finder cannot reasonably infer a defendant's mental condition at the time of the offense from evidence of his mental condition at a subsequent time. This argument plainly lacks merit and requires little discussion, as it is well established that a "defendant's state of mind may be proven by his conduct before, during and after the [offense]." (Internal quotation marks omitted.) *State* v. *Douglas*, 126 Conn. App. 192, 204, 11 A.3d 699, cert. denied, 300 Conn. 926, 15 A.3d 628 (2011).

We conclude that the court's express subordinate findings of fact are reasonably supported by the evidence. Moreover, the defendant has failed to meet his burden to establish that the court's rejection of his affirmative defense of mental disease or defect was not reasonably supported by the evidence.

## II

The defendant additionally claims that the court "erred as a matter of law in rendering an opinion on a matter that required expert testimony." The defendant asserts that, once a fact finder determines that a defendant had been suffering from a mental illness, the fact finder cannot make a finding as to whether that illness impaired the defendant's capacity to control his conduct unless there is expert evidence in the record regarding the effects of that illness on the defendant's behavioral controls. The defendant thus appears to argue that, because the court rejected the opinions of Lovejoy and Amble, and the state did not offer any rebuttal expert testimony, the court had no proper basis on which to conclude that "the defendant's mental disease did not diminish his ability to control his behavior." This claim clearly lacks merit.

It is well established that, although "expert testimony is of great assistance, the ultimate issue of sanity, including intent, is decided by the trier of fact." *State* v. *Evans*, 203 Conn. 212, 242, 523 A.2d 1306 (1987). Thus, this court has stated—albeit in the context of a petition by the state for an order of continued commitment of an insanity acquittee pursuant to General Statutes § 17a-593 (c)[23]—that "[t]he ultimate determination of mental illness . . . is a legal decision. . . . Although psychiatric testimony as to the defendant's condition may form an important part of the trial court's ultimate determination, the court is not bound by this evidence. . . . It may, in its discretion, accept all, part, or none of the experts' testimony." (Citation omitted; internal quotation marks omitted.) *State* v. *Damone*, 148 Conn. App. 137, 167 n.13, 83 A.3d 1227, cert. denied, 311 Conn. 936, 88 A.3d 550 (2014); see also *Ciarlelli* v. *Romeo*, 46 Conn. App. 277, 283, 699 A.2d 217 ("[o]ur courts have held that expert testimony is not required to prove . . . that a criminal defendant is sane after he raises an insanity defense"), cert. denied, 243 Conn. 929, 701 A.2d 657 (1997).

Moreover, even if we assume, arguendo, that expert testimony is generally required in such instances, the defendant's argument would still fail. Contrary to the defendant's assertion, there was expert testimony to support the court's ultimate conclusion. As both expert witnesses testified, a psychosis does not necessarily impair an individual's capacity to substantially control his conduct within the requirements of the law. Consequently, the court reasonably could have concluded that, although the defendant had been suffering from a psychosis at the time of the shooting, such psychosis did not impair his capacity to control his conduct within the requirements of the law.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The defendant originally appealed to our Supreme Court pursuant to General Statutes § 51-199 (b) (3). The appeal subsequently was transferred to this court pursuant to § 51-199 (c) and Practice Book § 65-1.

[2] The three judges were impaneled pursuant to General Statutes § 54-82.

[3] Although the court explicitly discussed only a fraction of the evidence adduced at trial in making its findings of fact, it did not indicate that its decision was based *exclusively* on this evidence. As our Supreme Court has stated, where the trial court, in explicating the evidence on which it relied in rejecting a defendant's insanity defense, does not indicate that it relied exclusively on such evidence, "[appellate courts] are free to examine the entire record to determine whether a fact finder reasonably could have concluded that the defendant had failed to establish that he lacked substantial capacity to control his desire to commit [the charged offense]." *State* v. *Quinet*, 253 Conn. 392, 410–11, 752 A.2d 490 (2000). Consequently, we properly may consider all of the evidence presented at trial in determining whether the court's rejection of the defendant's affirmative defense is reasonably supported by the record.

[4] Another police officer was blocking off the street from the other direction.

[5] As one of the construction workers testified, however, the defendant kept his right hand in his pocket throughout the encounter.

[6] A video recording of the police interview was admitted into evidence

at trial.

[7] The defendant also was charged with stealing a firearm in violation of General Statutes § 53a-212 (a). The state entered a nolle prosequi with respect to this count.

[8] The original language from the transcript of the court's oral decision provides, "there was nothing remarkable, untoward or *admirant* about the defendant's conduct." (Emphasis added.) In response to the defendant's motion for rectification, the court, *Kavanewsky, J.*, corrected the word "admirant" to "aberrant."

[9] The defendant also argues that the court "unreasonably ignored the totality of the record." This argument lacks merit. "[T]he trier [of fact] is bound to consider all the evidence which has been admitted, as far as admissible, for all the purposes for which it was offered and claimed. . . . [W]e are not justified in finding error upon pure assumptions as to what the court may have done. . . . We cannot assume that the court's conclusions were reached without due weight having been given to the evidence presented and the facts found. . . . Unless the contrary appears, this court will assume that the court acted properly." (Internal quotation marks omitted.) *Moye* v. *Commissioner of Correction*, 168 Conn. App. 207, 229, 145 A.3d 362 (2016), cert. denied, 324 Conn. 905, 153 A.3d 653 (2017).

In the present case, the defendant does not point to any specific evidence that the court purportedly failed to consider. The defendant merely speculates that the court considered only a fraction of the evidence presented at trial and asserts, in a conclusory fashion, that the court therefore "ignore[d] a vast array of undisputed facts." The court expressly stated in its oral decision, however, that it had "reviewed and considered all applicable statutes, testimony, exhibits, and arguments of counsel in deliberations upon this matter." "Ultimately, the court was not required to mention [any specific piece of evidence] because [t]he [trier of fact] can disbelieve any or all of the evidence on insanity . . . ." (Internal quotation marks omitted.) *State* v. *Campbell*, 169 Conn. App. 156, 166, 149 A.3d 1007, cert. denied, 324 Conn. 902, 151 A.3d 1288 (2016). Because the defendant has failed to show otherwise, this court will assume that the trial court acted properly.

[10] The state argues that our standard of review of the rejection of a defendant's affirmative defense is limited. According to the state, where the evidence was sufficient to prove that the defendant committed the charged offenses, "analysis of the evidence presented in support of his defense is unnecessary and inappropriate." This argument is inconsistent with controlling case law. Numerous decisions of both our Supreme Court and this court confirm that, in reviewing the fact finder's rejection of a defendant's affirmative defense, we consider the evidence presented at trial concerning the defendant's affirmative defense and determine whether, on the basis of that evidence, the fact finder's rejection of the defense was reasonable. See, e.g., *State* v. *Patterson*, 229 Conn. 328, 334–42, 641 A.2d 123 (1994) (summarizing evidence on defendant's affirmative defenses and concluding that, "because the court's rejection of the defendant's affirmative defenses is reasonably supported by the evidence, his claim must fail"); *State* v. *Campbell*, supra, 169 Conn. App. 161–68 (summarizing evidence regarding defendant's mental state and concluding that defendant "failed to meet his burden of establishing that the court's rejection of the affirmative defense of mental disease or defect was not reasonably supported by the evidence"); see also *State* v. *Steiger*, 218 Conn. 349, 376, 590 A.2d 408 (1991) (in appeal challenging trial court's rejection of defendant's affirmative defenses of insanity and extreme emotional disturbance, Supreme Court, "[t]o consider these claims properly . . . must necessarily summarize the voluminous evidence presented by the defendant and the state concerning the defendant's mental state").

[11] The defendant also produced a photograph of himself taken on the day of the offense, as well as his Bridgeport Hospital medical records, both of which were admitted into evidence without objection.

[12] The defendant's medical records from the department were not in evidence, although they were reviewed by both experts.

[13] In his written evaluation, Amble provided excerpts of the relevant portions of the defendant's medical records from the department. According to Amble, Downer completed an initial psychiatric evaluation of the defendant on March 31, 2015, and noted: "While he presented as odd, the undersigned believes his behavior was intentional as he is trying to feign mental illness to avoid penalty for alleged charges. He was avoidant of eye contact and while seated, [seemed] to be, 'coming in and out,' of different states of orientation and confusion. The mood is euthymic and with odd, bizarre

affect. Denies auditory or visual hallucinations, denies suicidal or homicidal ideation." According to Amble, on April 6, 2015, Downer further noted: "In light of collateral information, past custody records and presentation over his time in the infirmary, it can be stated with confidence [that the defendant] does not suffer with a mental illness and is not in acute risk of hurting himself or others. With the exception of the initial encounter, [the defendant] has been clear, logical and coherent, manifesting no symptoms of mood or psychotic disturbance. Informed him he would be discharged and he will continue to be seen by mental health for supportive intervention with psychotropic intervention to be employed if deemed necessary."

[14] Specifically, Amble asked the defendant, "[d]id you feel your body was overtaken by an evil spirit who took control of you and shot the man?" (Internal quotation marks omitted.) The defendant responded affirmatively. When asked to explain, the defendant initially stated that "something from the devil" had taken control of his body and fired the gun. (Internal quotation marks omitted.) Upon further probing, the defendant clarified that he perceived himself to be possessed by a demon.

[15] Evidence pertaining to the possible use of PCP or bath salts is as follows. The defendant reported to Lovejoy that he had "experimented with substances such as cocaine, hallucinogens and PCP" but that "he did not like the way that he felt after taking the substances and did not continue [using them]." According to Amble, one of the defendant's friends whom he interviewed—identified only by the nickname "Dread"—claimed that the defendant's wife had mentioned to Dread that she had smelled PCP on the defendant's breath two weeks before the incident. At this point in the telephonic interview, the call was disconnected, and Amble's subsequent attempts to contact Dread were unsuccessful. As Amble noted, the defendant's wife denied any awareness of the defendant having used PCP. In summarizing the defendant's medical records, Amble also noted that there was a notation in the department's records indicating that a urine toxicology screen performed at Bridgeport Hospital had tested positive for PCP, which, as Amble recognized, directly contradicted the Bridgeport Hospital records. In an attempt to resolve this discrepancy, Amble contacted the individual at the department who had made the notation. According to Amble, she could not recall why she had made that notation.

At trial, Amble conceded that the defendant's behavior around the time of the shooting could also be consistent with PCP use or with the use of "bath salts," also known as "synthetic marijuana." According to Amble, synthetic marijuana "has a much more potent . . . psychogenic effect on individuals [than marijuana]," and it is commonly used by people who know that they are going to be subjected to drug testing because there is not a readily available, reliable test for it. Ultimately, however, the trial court found that there was insufficient evidence to conclude that the defendant's mental state had been the product of PCP use.

[16] Regarding the "labor dispute" explanation he had given to LaMaine, the defendant told Amble, "[i]t was like I was a mechanic and this was a labor dispute." (Internal quotation marks omitted.) When asked what was specifically in his mind at the time of the offense, he responded, "I don't know where [this explanation] came from and why." (Internal quotation marks omitted.)

[17] In discussing its rejection of the experts' opinions, the court observed that "their testimony and . . . reports show at least as much divergence as they do uniformity in the basis for their opinions." The defendant argues that "this observation does not justify rejecting both experts' conclusions." We conclude that this claim is inadequately briefed. "We are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *State* v. *Fowler*, 178 Conn. App. 332, 345, 175 A.3d 76 (2017), cert. denied, 327 Conn. 999, 176 A.3d 556 (2018). The defendant devotes less than one page of his brief to his claim, provides no legal authority to support it, and fails to adequately explicate the basis for it. See id., 344–45, and cases cited therein. Accordingly, we decline to address this claim.

[18] The defendant argues that the court's ultimate conclusion that his mental illness did not diminish his ability to control his behavior is not reasonably supported by the evidence. More specifically, the defendant contends that this conclusion is not logically supported by the court's subsidiary findings of fact—namely, that he greeted and exchanged pleasantries with the construction workers, made overtures for a job, and behaved appropriately during the police interview—because these findings are not necessarily

inconsistent with a conclusion that the defendant was legally insane. In other words, the defendant's position appears to be that, in order to reasonably infer that he was legally sane from circumstantial evidence of his state of mind, such evidence must be so strong as to exclude every other possible inference. This argument plainly lacks merit, as it contravenes the well-established principle that "[p]roof of a material fact by inference from circumstantial evidence need not be so conclusive as to exclude every other hypothesis." (Internal quotation marks omitted.) *State* v. *Berthiaume*, 171 Conn. App. 436, 444, 157 A.3d 681, cert. denied, 325 Conn. 926, 169 A.3d 231, cert. denied, 138 S. Ct. 403, 199 L. Ed. 2d 296 (2017).

[19] See footnote 3 of this opinion.

[20] Relying on our Supreme Court's decision in *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 112 A.3d 1 (2015), the defendant argues in the alternative that a "reviewing court may assess the reasonableness of a trial court's decision regarding an expert's opinion when it is based not on demeanor but on the foundation of the opinions and the factual record" and that, therefore, "this court is not bound to defer to the [trial court's] rejection of the [opinions of the] experts . . . ." As explained in footnote 22 of this opinion, the de novo review sanctioned in *Lapointe* is limited to factually similar cases involving a trial court's *predictive* assessment of the credibility of expert testimony. This is not such a case.

[21] LaMaine also testified that the defendant had stated that he was employed as a mechanic by a company called "AA." There was no evidence presented at trial to indicate that the defendant had ever worked as a mechanic or for a company called "AA," which fact the defendant cites on appeal as an indication of his delusional thinking at the time of the shooting. The only mention of "AA" in the record is in Lovejoy's written evaluation. The defendant reported to Lovejoy that, on the night before the shooting, he had been placing pages from a phone book into neighbors' mailboxes in the belief that the pages represented messages. According to Lovejoy, the defendant believed that one of these messages related to "AA Automotive." As the defendant appears to suggest, this evidence reasonably might be construed to support the defendant's contention that he was delusional at the time of the shooting. The trial court, however, evidently did not find this evidence to be so strong as to preclude its finding that the defendant's actions were motivated by nonpsychiatric factors. Accordingly, to the extent the defendant is arguing that this evidence renders the court's finding clearly erroneous, we disagree.

[22] The defendant appears to argue that we may review this finding de novo because "[t]here was no live witness whose credibility could only be assessed by the fact finder," and that, therefore, this court is in as good a position as the trial court to assess the defendant's demeanor during the interview. For this proposition, the defendant relies on our Supreme Court's decision in *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 225. We are not persuaded.

In *Lapointe*, the habeas court was tasked with evaluating the materiality of a petitioner's claims under *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). *Lapointe* v. *Commissioner of Correction*, supra, 316 Conn. 266–67. Our Supreme Court applied de novo review when assessing the habeas court's determination "that the testimony of the petitioner's experts, when viewed in light of [the respondent's expert's] testimony, was not sufficiently credible to give rise to a reasonable probability of a different result at the original trial . . . ." Id., 267. Our Supreme Court concluded that the "habeas court's assessment of the testimony of [the petitioner's experts] was not predicated on their demeanor or conduct on the witness stand, nor was it related to anything else that would reflect adversely on their credibility, such as untruthfulness, bias, poor memory or substandard powers of observation. That assessment also was not dependent on any underlying factual findings requiring the trial court's firsthand observation and determination of the credibility or reliability of other witnesses. Rather, the . . . habeas court rejected the opinions of [the petitioner's experts] solely because, in its view, those opinions lacked an adequate foundation, first, because they were premised on facts that were contrary to the record in the case, as reported by [the respondent's expert], and, second, because the court did not credit the scientific underpinnings of those opinions. In such circumstances, when the habeas court's assessment of the expert testimony has nothing to do with the personal credibility of the expert witness but instead is based entirely on the court's evaluation of the foundational soundness of the witness' professional opinion, this

court is as well situated as the habeas court to assess that testimony for *Brady* purposes." Id., 268–69. Accordingly, the court saw no reason to defer to the habeas court's assessment of the materiality of the expert testimony. Id., 272.

Importantly, however, our Supreme Court was careful to emphasize that "[its] conclusion . . . [was] limited to the kind of fact-finding that is implicated in the *Brady* context." Id., 272 n.42. That is to say, its conclusion was limited to a habeas court's "predictive or probabilistic judgment as to whether the original jury reasonably might have credited the testimony of the petitioner's experts"; id., 272; as opposed to a "trial court's findings with respect to the underlying historical facts . . . ." (Internal quotation marks omitted.) Id., 273 n.43. As the court explained, "a habeas court's credibility determination [in the context of a *Brady* claim] is not an 'absolute' finding, as the factual findings of the ultimate finder of fact are, but merely is a threshold evidentiary assessment required for the purpose of determining whether the ultimate finder of fact reasonably could credit the evidence . . . ." Id., 272 n.42.

The present case clearly is not one of the rare cases for which *Lapointe* requires de novo review. See id., 307 ("only in the rare case that a litigant can establish that his case is materially similar to [that in *Lapointe*] will he be entitled to de novo review of the lower court's materiality determination"). In the present case, the court heard testimony from Detective Ortiz regarding his interview of the defendant, reviewed the video recording made of that interview, and, on the basis of this evidence, made an "absolute finding" regarding the defendant's conduct and demeanor during the interview. (Internal quotation marks omitted.) See id., 272 n.42. Thus, the court's factual finding does not constitute the sort of predictive or probabilistic judgment at issue in *Lapointe*, and, consequently, the defendant's reliance on *Lapointe* in unavailing. We therefore limit our review to whether that finding is clearly erroneous. See *State* v. *Smith*, 107 Conn. App. 666, 675, 946 A.2d 319 (reviewing for clear error trial court's finding that photographs included in array all matched description of victim's attacker and that defendant's photograph did not stand out from all other photographs in such manner as to influence victim's identification), cert. denied, 288 Conn. 902, 952 A.2d 811 (2008).

[23] General Statutes § 17a-593 (c) provides: "If reasonable cause exists to believe that the acquittee remains a person with psychiatric disabilities or a person with intellectual disability to the extent that his discharge at the expiration of his maximum term of commitment would constitute a danger to himself or others, the state's attorney, at least one hundred thirty-five days prior to such expiration, may petition the court for an order of continued commitment of the acquittee."